73 A.3d 1145

POINT'S REACH CONDOMINIUM COUNCIL
OF UNIT OWNERS, et al.

v.

The POINT HOMEOWNERS ASSOCIATION, INC.

No. 1070, Sept. Term, 2011.

Court of Special Appeals of Maryland.

Aug. 30, 2013.

K. King Burnett (Roscoe R. Leslie, Webb, Burnett, Cornbrooks, Wilber, Worhis, Douse & Mason, LLP, on the brief), Salisbury, MD, for Appellant.

Richard J. Magid (Whiteford, Taylor & Preston LLP, on the brief), Baltimore, MD, for Appellee.

Panel: EYLER, DEBORAH S., ZARNOCH, and MATRICCIANI, JJ.

EYLER, DEBORAH S., J.

This case concerns the residential real estate development of Section 17 of Ocean Pines, in Worcester County. Section 17 is 139 acres of land more or less, some fronting on the Isle of Wight Bay. A "Planned Unit Development" known as "The Point" was built on Section 17. The Point consists of, at the very least, 124 single-family residences. In addition to these residences, the same developer built three waterfront condominium buildings known as "Point's Reach Condominium." Whether the unit owners in "Point's Reach Condominium" are required to belong to the Point's Reach Homeowners Association is the central question in this case.

In the Circuit Court for Worcester County, Point's Reach Condominium Council of Unit Owners, William and Elizabeth Iampieri, and Leonard Nemec (collectively "Point's Reach Condominium" or "the Condominium"), the appellants, sued The Point Homeowners Association, Inc. ("The Point HOA" or "the HOA"), the appellee, for declaratory and injunctive relief. They asked the court to find that the Condominium is not part of The Point and is not subject to the Declaration of Restrictions for The Point, as revised and restated in 2000; and that the Condominium unit owners therefore have no obligation to belong to The Point HOA and to pay fees (including annual dues) that the HOA assesses. They sought a permanent injunction prohibiting the HOA from assessing fees against the unit owners and also sought reimbursement of HOA dues previously paid by unit owners and attorneys' fees.

The case was tried to the court for two days, with the second day consisting of the ruling of the court. Counsel for the parties stipulated to numerous relevant documents, which were moved into evidence. The Condominium called three witnesses: Mr. Iampieri, who with his wife owns a unit in the Condominium; Brian Carney, a unit owner and the immediate past Treasurer of the Condominium's Council of Unit Owners; and Mr. Nemec, the trustee of a trust that owns one of the units. The HOA called two witnesses: David Meinhardt who, through his business entity Banker's Development, LLC ("Banker's"), developed Section 17; and John Nesbit, owner of a single-family home in The Point and President of The Point HOA.

In ruling from the bench, the court found that the Declaration of Restrictions for The Point, as revised and restated in 2000, which created the HOA and required membership in it, is not clear as to whether it covers the Condominium units. The court had admitted extrinsic evidence on that issue and, applying the equitable doctrine of implied reciprocal negative covenants, ruled that the Condominium unit owners are subject to that declaration and therefore must belong to the HOA and pay the fees it assesses. The court further found that the HOA is authorized to assess fees. Upon these findings, the court denied all relief sought by the Condominium. It entered a one-page order embodying its ruling.

Unhappy with that outcome, the Condominium noted this appeal, raising four questions for review, which we have combined, reordered, and reworded:

I. Did the trial court err in finding that the Condominium unit owners are bound by the Declaration of Restrictions, as revised and re-stated in 2000, which requires membership in the HOA?

II. Did the trial court err by failing to decide whether the HOA has the power to assess fees?

III. Did the trial court's oral declaratory judgment ruling together with its accompanying written order satisfy

the requirement that the court issue a written declaration of the rights of the parties? [1]

We conclude that the 2000 Revised and Restated Declaration of Restrictions ("2000 Declaration") is clear as to its parties and the lots expressly covered, which do not include the Condominium, but also is clear that all property owners within The Point—which includes the Condominium—must belong to the HOA. Moreover, many of the restrictions in that declaration are, by the declaration's plain language, for the benefit of The Point as a whole, not just the lots expressly covered by the declaration. The inclusion of seemingly inconsistent provisions in this single document creates ambiguities, which leads us to conclude that the trial court properly admitted extrinsic evidence to resolve them. We further conclude that the trial court properly applied the doctrine of implied negative reciprocal covenants, and the evidence relevant to that doctrine strongly rebutted the presumption, arising from the Condominium unit owners not being parties to the 2000 Declaration or the 2000 Declaration not being later revised to include them, that the common grantor did not intend that the unit owners be required to belong to the HOA.

Finally, we conclude that the trial court in fact decided that the HOA has the power to assess fees; that that decision was legally correct; and that the trial court's procedural error in not memorializing its decision in writing, after announcing it in detail on the record, does not preclude our review of the

---

1. The issues as framed by the Condominium are:

 1. Whether the condominium unit owners are required to be members of the homeowners' association and are required to pay mandatory fees when the land on which the condominium is situated is not identified in the declaration of restrictions creating the requirements.

 2. Whether the doctrine of implied negative reciprocal easements was improperly applied by the trial court.

 3. Whether the homeowners' association has the power to assess mandatory fees under the applicable declaration of restrictions.

 4. Whether, in addition to issuing a ruling correcting the errors on the merits, a written declaration of rights should have been part of the trial court's ruling and should be issued upon remand.

issues, was harmless, and can be corrected on remand without reversing the judgment.

## FACTS AND PROCEEDINGS

### County Approval of Development of Section 17 of Ocean Pines and Later Purchase of Section 17 by Banker's [2]

On December 5, 1989, the then-owner of Section 17 of Ocean Pines obtained Step I approval from the Worcester County Commissioners for the "Isle of Wight/Turville Creek Planned Unit Development ["PUD"]" in accordance with the county's master land use plan of September 1, 1987.[3] Almost four years later, on August 19, 1993, Step II approval was obtained by a successor owner, which had changed the name of the proposed development to the "Manklin Creek PUD" and had added a portion of Section 15 of Ocean Pines to it. The plan

---

**2.** These facts, which are undisputed, are gleaned primarily from documents that were moved into evidence.

**3.** Section 1–319 of the Worcester County Zoning and Subdivision Control ("Z & SC") ordinance, in effect in 1989, governed "Planned unit developments." Subsection (a) stated that,

> The purpose of this provision is to encourage the design of well-planned, larger scale developments which will offer a variety of building types or more attractive and efficient overall planning in accordance with the goals of the comprehensive plan. The procedures and standards in this provision are intended to permit, upon the recommendation of the planning commission and the approval of the county commissioners, diversification in the size, type and location of structures while ensuring adequate standards consistent with the purpose of this article.

> The section establishes the PUD as a "floating zone" that may be permitted in certain zoning districts (subsection (b)); lists the uses and structures permitted in a PUD, including "multi-family dwellings," (subsection (c), and subsubsection (c)(2)); and sets forth the Step I (Justification), Step II (Plan development phase), and Step III (Execution step) plans that shall be approved by the Planning Commission and the Board of County Commissioners. Section 1–319(i). **After step III approval, "the PUD shall be considered a major subdivision** and shall be subject to all major subdivision procedures and approvals," although the Planning Commission may waive subdivision requirements where "necessary and appropriate." (Emphasis added.) *Id.* at section 1–319(i)(3).

for the Manklin Creek PUD as originally given Step II approval shows single family and multi-family residential structures, the latter to be located near the Isle of Wight Bay waterfront, where the Condominium buildings now stand.

With another transfer in ownership, the name of the development reverted to the "Isle of Wight/Turville Creek PUD" and the area of the PUD was reduced to encompass Section 17 of Ocean Pines only, as it had originally. On June 1, 1995, the Worcester County Commissioners gave Revised Step II approval for the PUD. Thereafter, ownership of Section 17 changed hands several more times. By 1997, Section 17 was owned by the Balfour Real Estate Group, d/b/a BRE/OCEAN PINES, LLC ("Balfour"). Balfour sold a few lots but did not begin construction of infrastructure or residences. Sometime in 1999, Mr. Meinhardt decided to purchase Section 17 from Balfour to develop it, and formed Banker's for that purpose.

### *1999 Declaration of Restrictions and Related Plats for The Point*

On August 30, 1999, Banker's, through Mr. Meinhardt as signatory, finalized a document entitled,

### *DECLARATION OF RESTRICTIONS*
### *THE POINT*
### *SECTION 17—OCEAN PINES*

("1999 Declaration"). Mr. Meinhardt drafted the 1999 Declaration using a form composed by Balfour. The 1999 Declaration was recorded in the Land Records of Worcester County ("Land Records") on September 3, 1999, together with the deed conveying Section 17 of Ocean Pines from Balfour to Banker's. The 1999 Declaration incorporated by reference a Plat, dated August 1999, and recorded in the Land Records on September 3, 1999 ("the 1999 Plat").[4] The 1999 Plat is entitled,

---

4. The 1999 Plat is filed in the Land Records at SVH 160/56–70.

*The Villages at* **Ocean Pines**
SECTION 17—THE POINT—PHASE I & IA
RECORD PLAT
OCEAN PINES, THIRD TAX DISTRICT,
WORCESTER COUNTY, MARYLAND.

The 1999 Plat depicts 90 residential lots to be developed as single family homes, 7 "outlots," and other planning indications. Note 22 on the 1999 Plat states, "This property is part of and therefore subject to the Isle of Wight/Turville Creek Planned Unit Development. . . ."

The 1999 Plat shows "Phase I" of "The Point" as comprising some of the land south of Ocean Parkway, an east-west thoroughfare that bisects Section 17. A semi-circular area denoted "Parcel A," and a sliver of land inside Parcel A, next to Ocean Parkway and denoted "Outlot A," appear in the middle of Section 17, immediately south of Ocean Parkway. Parcel A, which is not part of Phase I, is labeled, "Remaining Lands of Banker's Development LLC Reserved For Future Development." Note 21 on the 1999 Plat states, "Parcel A is not being approved for building purposes at this time. This area is intended to be developed in the future as a multi-family area." Pine Forest Drive is depicted as a U-shaped road, beginning and ending on Ocean Parkway, on the boundary of Parcel A. The lots in Phase I are to the south of Pine Forest Drive.

The 1999 Plat also shows "Phase IA" of The Point, which comprises some land in Section 17 north of Ocean Parkway. The land depicted on the 1999 Plat where the Condominium buildings now are located, next to the Isle of Wight Bay, is marked "Remaining Lands of Banker's Development LLC Reserved for Future Development."

In the 1999 Declaration, a series of introductory "WHERE-AS" clauses states among other things that Banker's owns "SECTION 17—THE POINT" as depicted in the 1999 Plat; that "all of the real property described in the Plats comprises Section 17 . . . generally known as 'THE POINT' (herein called 'the Section,' or 'The Point')"; that there are subdivided

"single-family detached numbered residential lots (herein called 'the Lots') set forth and described in the Plats" that were filed or are to be filed in the Land Records; and that "Declarant is about to sell and convey the Lots; and, before doing so, It desires to subject them to and impose upon them mutual and beneficial restrictions ... for the benefit and complement of all of the Lots in the Section and Subdivision...."

In the following "NOW, THEREFORE" clause, the 1999 Declaration states that all of "the Lots" shall be sold, held, etc., subject to the restrictions that follow. Section 1, entitled "Applicability," provides: "Restrictions shall apply to Lots only and are specifically excluded from application to other property in the Section and depicted on the Plats as roadways and open space, which are intended to be conveyed to Ocean Pines Association ...." (the "OPA"). The 1999 Declaration sets forth its term (section 2); states that the "Restrictions and agreements ... are made for the mutual and reciprocal beneficial [sic] of each and every Lot in the Section and the Subdivision ...." (section 3); provides that the "Lots shall be used only for the purposes set forth herein, on the Plats, or as provided by" law, and subject to the provisions of the Environmental Control Committee ("ECC") of the OPA (section 4); and explains the "Philosophy of Development," which among other things is to "establish a level of aesthetics, which will benefit the value of individual homes and properties, and therefore the entire community" (section 5).

Section 6 of the 1999 Declaration provides the procedure for design plans to be submitted for approval to Banker's and the ECC. Subsection 6.1 explains that "[t]he authority and prerogatives of the ECC provided for in this Declaration shall extend only to any Lots and shall not apply to any parcels to be developed by the Declarant for any use other than single-family detached numbered residential lots." Section 6.5, which addresses review fees for those submitting plans for approval, provides at subsection 6.5.2 that "Review fees for residential products other than single-family, or for modified

dwelling designs, or for commercial uses ... may be established from time to time by the Declarant."

Section 7, devoted to design criteria, describes the size, configuration, colors, materials, setbacks, landscaping, trees, fences, patios, decks, driveways, and other features of the single family homes planned for The Point. It also states, at Subsection 7.5:

*Multi–Family.* Multi–Family design standards shall be consistent with the architectural design theme and shall be subject to criteria to be established by Declarant.

Additional sections of the 1999 Declaration address the composition of and procedures before the ECC (section 8); general prohibitions and requirements (section 9); variances and fines (section 10); easements (section 11); and ownership, use, and enjoyment of streets, parks, and recreational amenities (section 12). Section 13 requires, with some exceptions, that "[e]very person who acquires title ... to any Lot in the Section shall become a member of the OPA...." Sections 14, 15, and 16 deal with other rights of the OPA and remedies it may pursue. Finally, section 17 provides among other things that grantees of "any Lot subject to the coverage of this Declaration" accept their deeds or contracts subject to the Restrictions and agreements in the document.

### 2000 Revised Step II Plan, Declaration, and Plats

On April 6, 2000, the Worcester County Planning Commission approved a "Revised Step II Master Plan for the Isle of Wight (Section 17) Portion of the Isle of Wight/Turville Creek PUD." The Isle of Wight Portion of the PUD is the land adjacent to the waterfront, where the Condominium buildings presently are located. The next day, Phyllis Wimbrow, Planning Administrator, wrote to Mr. Meinhardt, stating:

The purpose of this revised Step II plan was to illustrate the waterfront area as being developed with multi-family units in three three-story structures, comparable to that shown on the Step I plan approved by the County Commissioners on December 5, 1989, as opposed to single-family

dwellings as was shown on the last approved Step II plan. Based upon its review, the Planning Commission approved the revised Step II master plan as presented.

Copies of the approved Step II master plan are enclosed for your records. . . .

The April 7, 2006 letter from Ms. Wimbrow attaches the Revised Step II master plan, which depicts three condominium buildings in the area of Section 17 that borders the Isle of Wight Bay, where the Condominium buildings later were constructed. The Revised Step II plan lists among its "SITE DATA,"

Site area 130.32 ac. ±
Single family
Existing Section I = 1 thru 90
Proposed Section II = 91 thru 110
Proposed Section III = 111 thru 126
Multi–Family
Proposed 75 units
Total Density = 201

On June 1, 2000, Ms. Wimbrow again wrote to Mr. Meinhardt, stating:

This is to confirm that I have reviewed the above referenced Step II plan for the Isle of Wight (Section 17) portion of the Isle of Wight/Turville Creek P.U.D. The purpose of this revised Step II plan was to indicate minimum yard setbacks for the lots in Sections 2A and 2B. Based upon my review, I have approved the revised Step II master plan as presented.

Copies of the approved Step II plan are enclosed for your records. . . .

The attached revised Step II plan for the Isle of Wight portion of the PUD, on Section 17 of Ocean Pines, is similar to the one attached to Ms. Wimbrow's April 7, 2006 letter, with two exceptions. First, the various phases of the development are marked, showing their locations in Section 17 of Ocean Pines, and the units proposed in each. For example, the area of Section 17 comprising Phase I is marked "Phase One 66

Family Lots." The area of Section 17 that depicts the three buildings constituting the Condominium is marked "Phase Three 78 Multi–Family Units." Second, the "SITE DATA" has been changed to a total density of 202 units, and the nomenclature used to describe the units to be developed has been changed to match the nomenclature in the 1999 Plat:

Site area 130.02 ac. ±

Single Family

Existing Phase One and One–A = Lots 1 thru 90

Proposed Phase Two–A = Lots 91 thru 110

Proposed Phase Two–B = Lots 111 thru 124

Multi–Family

Proposed Phase Three = 78 units

Total density = 202

On December 12, 2000, Mr. Meinhardt drafted the 2000 Declaration, which is entitled,

### *REVISED AND RESTATED DECLARATION OF RE- STRICTIONS*
### *THE POINT*
### *SECTION 17—OCEAN*
### *PINES PHASES 1, 1A, 2A & 2B*

He used the same form he had used in drafting the 1999 Declaration, and much of the same language. The 2000 Declaration was filed in the Land Records the following day, December 13, 2000.

The 2000 Declaration attaches and incorporates by refer- ence the Phase 1 and 1 A Plat, together with two additional plats ("the 2000 Plats"). The first additional plat is entitled,

RESUBDIVISION PLAT,

## THE POINT, PHASE 2A

PARCEL A & OUTLOT A, THE POINT, PHASE I AND IA,

SECTION 17, OCEAN PINES

THIRD TAX DISTRICT, WORCESTER COUNTY, MARYLAND [5]

---

5. This Plat is filed in the Land Records at SVH 166/45–47.

This Plat shows a revised Outlot A that has been expanded to encompass most of Parcel A, and is now designated for open space with a large pond and storm water management area. It also shows that the outer U-shaped perimeter of what used to be Parcel A has been replaced by a new road—Park Side Circle—immediately south of which 20 single-family residential lots have been added. These lots are situated inside what used to be Parcel A, between the new Park Side Circle and the existing Pine Forest Drive. Thus, on the 2000 Plat for Phase 2A, Parcel A no longer is designated for multi-family units as it had been in the 1999 Plat, and has been replaced with what essentially is a park, a second U-shaped road, and 20 single-family home lots.

The second additional plat is entitled,

RECORD PLAT

SUBDIVISION PLAT

THE POINT, PHASE 2B

SECTION 17, OCEAN PINES

THIRD TAX DISTRICT, WORCESTER COUNTY, MARYLAND [6]

This Plat depicts 14 single-family residential lots, all located east of the areas designated as Phases I, IA, and 2A, and closer to the portion of Section 17 that is adjacent to the Isle of Wight Bay. On this Plat, the land east of the termini of Phase 2B and Ocean Parkway, immediately west and adjacent to the Isle of Wight Bay, is open space marked "Remaining Lands of Developer." That is the area where the Condominium buildings later were erected. Thus, in accordance with the Revised Step II Plan for The Point, the 2000 Plats showing Phases I and IA, 2A, and 2B depict 124 single-family residence lots and no longer show a central area future phase for multi-family dwellings. That multi-family dwelling future phase was eliminated from the Plats but, as the April 6, 2000 letter from Ms. Wimbrow shows, multi-family units in The Point were to be developed in a new future phase of three three-story structures along the Isle of Wight Bay waterfront.

---

6. This Plat is filed in the Land Records at SVH 166/48–50.

The opening paragraph of the 2000 Declaration states that it is being made by Banker's and Meinhardt as attorney-in-fact for all parties set forth in attached Exhibit A, to be referred to as "Lot Owners." None of the signatories to Exhibit A are Condominium unit owners.

The series of WHEREAS clauses in the 2000 Declaration sets forth the following relevant information. First, at the time of recordation, the Declarant (Banker's) owns all the real property set forth and described in the series of plats entitled " 'SECTION 17—THE POINT—PHASE 1 & 1A,' 'THE POINT, PHASE 2A,' and 'THE POINT, PHASE 2B' (herein called "the Plats")," which are incorporated by reference.[7] Second, "all of the real property described in the Plats comprises Phase 1, 1A, 2A, & 2B of Section 17, Ocean Pines, Worcester County, Maryland, generally known as 'THE POINT' (herein called 'the Section' or 'The Point')."

The WHEREAS clauses continue as follows:

WHEREAS, there are **subdivided single-family detached numbered residential Lots (herein called "the Lots") set forth and described in the Plats** which Declarant intends to sell to the general public, the remaining property **in the Section** consisting of future phases for residential Lots which Declarant also intends to sell to the general public, as well as amenities, roadways and open space not intended to be sold to the general public; and

WHEREAS, Declarant desires **to subject the Lots to and impose upon them mutual and beneficial restrictions, covenants, conditions, and charges, herein collectively referred to as "Restrictions," under a general plan**

---

7. The language is:

WHEREAS, Declarant is at time of recordation of these restrictions the owner or authorized representative of owners of all the real property set forth and described on that certain series of plats, entitled "SECTION 17—THE POINT—PHASE 1 & 1A," "THE POINT, PHASE 2A," and "THE POINT, PHASE 2B" (herein called "the Plats"), which Plats are recorded or are intended to be recorded among the Land Records of Worcester County Maryland, and are made a part hereof and incorporated herein by reference.

or scheme of improvement for the benefit and comple-
ment of all of the Lots in the Section and the Subdivi-
sion;

\* \* \*

WHEREAS, Lot Owners, by their attorney in fact, join
herein for the sole purpose of subjecting their Lots to this
Revised and Restated Declaration of Restrictions.

(Emphasis added.)

The WHEREAS clauses are followed by a general "NOW
THEREFORE" declaration by Banker's

that **all of the Lots are held** and shall be held, conveyed,
hypothecated or encumbered, leased, rented, used, occupied
and improved **subject to the following Restrictions, all of
which are declared and agreed to be in furtherance of a
plan for the Subdivision, and are established and agreed
upon for the purpose of enhancing and protecting the
value, desirability and attractiveness of the property
described in the Plats and of the Subdivision as a
whole** . . . .

(Emphasis added.) The first paragraph, entitled "Applicabili-
ty," states that the Restrictions "shall apply to Lots only and
are specifically excluded from application to other property in
the Section **and** depicted on the Plats as roadways and open
space, which are intended to be conveyed to [OPA] . . . ."
(Emphasis added.) The "Limitations on Use" section provides
that: "Lots shall be used only for those single-family residen-
tial or multi-family residential purposes set forth herein, on
the Plats, or as provided by [law] . . . ." In Paragraph 2, the
Restrictions are said to run with the land and be binding on all
parties or persons claiming under them until January 1, 2011,
at which time the Restrictions shall be extended for successive
ten year periods, unless a document agreeing to change them
is signed by a majority of the then owners "of Lots subject
thereto"; is recorded; and is approved by the OPA Board of
Directors.

Paragraph 3, entitled "Mutuality of Benefit and Obligation,"
provides:

The Restrictions and agreements set forth herein are made for the mutual and reciprocal benefit of each and every Lot **in the Section and the Subdivision** and are intended to create mutual, equitable servitudes upon each of the said Lots in favor of each and all of the other Lots therein; to create reciprocal rights between the respective owners of all of the other Lots therein; to create privities of contract and estate between the grantees of said Lots, their heirs, successors or assigns, and shall, as to the owners of each such Lot, their heirs, successors, or assigns **operate as covenants running with the land for the benefit of each and all other Lots in the Section and Subdivision and their respective owners.**

(Emphasis added.)

The Point HOA is created in paragraph 12B of the 2000 Declaration, which states:

*Homeowners Association.* **Every owner of property within the Section shall be required to join the Homeowners Association entitled "The Point Homeowners Association" ("the Homeowners Association").** The purpose of the Homeowners Association is to provide for the maintenance of amenities and other property within the Section that will be either: (a) utilized as amenities exclusively for the property owners and/or residents within the Section (to the exclusion of the remainder of property owners within Ocean Pines Subdivision) or; (b) for the maintenance of property designated as open spaces, entrance facilities, sidewalks, or other public areas not under single ownership which are not accepted for ownership by Ocean Pines Association, Inc. The formation of, and obligations of the members of, the Homeowners Association shall be as set forth in the provisions of Title 11B of the *Real Property Article* of the Annotated Code of Maryland. The provisions of the assessment structure and provisions for the collection of assessments of the Homeowners Association shall, likewise, be as set forth in Article 11B of the Real Property Article as aforesaid.

(Emphasis added.) In addition, paragraph 13A requires membership in the OPA by "[e]very person who acquires title, legal or equitable, to any Lot in the Section...."

### Sales of Single–Family Residences and Condominium Units

The lots designated for single-family houses began to be sold in late 2000, upon recordation of the 2000 Plats. Beginning in early 2001, Mr. Meinhardt circulated written marketing material promoting The Point. The opening paragraph of the material states:

> The Point is a private residential community representing the last and finest undeveloped section of Ocean Pines. **The community is comprised of 124 single family lots, 75 luxury bay front condominiums,** extensive amenities and will set a new standard for luxury in Ocean Pines and Worcester County.

(Emphasis added.)

The marketing material for The Point describes the "Community Features" to include "Spectacular Entrance," "Private Equity Club," "Traditional American Seaside Architectural Covenants," "**75 Luxury Bayfront Condominiums,**" "Park Side Homes (Phase 2A)," and "New Phase 2B–Large Single Family Lots." (Emphasis added.) The material includes two aerial photographs of the community and a professional drawing prepared by Soule & Associates entitled "The Point at Ocean Pines." The drawing depicts all the lots shown on the Plats for Phases I, IA, 2A, and 2B **and** the three multi-family buildings planned to constitute the Condominium, as they are depicted in the revised Step II plan for the PUD. Also attached is a list of "Lot Availability (2/15/01)" and drawings of three designs of single-family houses.

When the written marketing material for The Point was prepared, a website was established at sales@thepoint atoceanpines.com. Like the written material, the website describes The Point as a "**community ... comprised of 124 single family lots, 75 luxury bayfront condominiums,** [and]

extensive amenities." (Emphasis added.) The website was designed to allow a user to navigate to a section of the website entitled "Bayfront Condos" and to there see drawings depicting the three buildings that would comprise the Condominium.

Mr. Meinhardt prepared a two-page "Seller's Disclosure" for "The Point, Section 17, Ocean Pines, Maryland," dated August 21, 2003. It states that Banker's is making the following listed disclosures in accordance with the Maryland Homeowners Association Act. Disclosure 3 identifies the homeowners association as the OPA, but states, "[a]lso, it is anticipated that The Point Homeowners Association will be formed." Disclosure 4 reads:

The Point is comprised of approximately 139 acres, **and shall contain 124 single family lots within Phases 1, 1A, 2A and 2B, and a minimum of 75 and a maximum of 115 multi-family lots planned for subsequent phases on land to be owned by Seller [Banker's]**. . . .

(Emphasis added.) Disclosure 6 identifies the numerous attachments to the "Seller's Disclosure," including the 2000 Declaration, and "The Point Homeowners Association projected annual stabilized budget." That budget shows "Community" revenue of $29,850, to be received from 199 members each paying an annual assessment of $150; and further shows "Community" expenditures totaling $29,850 (comprised of $10,000 for electricity for streetlights, $14,000 for landscaping, $3,000 reserved for future repairs, and $2,850 for "contingency").

Finally, disclosure number 9 states in relevant part:

Regarding The Point Homeowners Association, which may first be levied August 1, 2001, articles of incorporation to be filed . . . shall specify: the procedure for increasing or decreasing such fees or assessments; how fees or assessments and delinquent charges will be collected; that unpaid fees or assessments are a personal obligation of owners of lots; that unpaid fees or assessments shall bear interest at an annual rate of 18%; and unpaid fees or assessments, including any late charges or attorney's fees, may be en-

forced by imposing a lien on a lot under the terms of the Maryland Contract Lien Act.

On June 18, 2004, The Point HOA was established.

### 2004 Point's Reach Condominium Declaration and Development of Condominium

On October 8, 2004, the "Declaration of Point's Reach Condominium A Horizontal Property Regime (An Expanding Condominium)" was created pursuant to Title 11 of the Maryland Real Property Article. ("2004 Condo Declaration"). The three Condominium buildings were erected, each three stories tall and located on the roughly 10–acre portion of Section 17 between the eastern boundary of Phase 2B and the Isle of Wight Bay waterfront—just as depicted in the revised Step II plan approved by the Worcester County Planning Commission in April and June 2000. The 2004 Condo Declaration was recorded in the Land Records on October 8, 2004, the same day it was drafted, together with Condominium Plat One, dated September 28, 2004, which covers Phase One of the Condominium, i.e., the first building, consisting of 27 units. The Council of Unit Owners of the Condominium was established at the same time, on October 8, 2004.

The 2004 Condo Declaration makes no mention of either the 1999 or 2000 Declaration. Nor does it mention The Point HOA, except in Article IV, Section 4, entitled "Easements," which states at subsection (c):

Pedestrian access easement. The common elements of the condominium shall be subject to an access easement, for ingress and egress to and from the condominium pier, as shown on the Condominium Plats for use **by all owners of condominium units, members of the Point Homeowners Association and guests and invitees of said unit owners and members.**

(Emphasis added.) The 2004 Condo Declaration provides that the property described in attached Exhibit A (which is the legal description of the land comprising the first phase of the Condominium construction) shall be held, conveyed, etc., sub-

ject to the covenants, and restrictions set forth therein, including the attached by-laws. The attached Condominium Plat further states that,

This property is part of and therefore subject to the Isle of Wight/Turville Creek Planned Unit Development as Approved (Step I) by the Worcester County Commissioners on December 5, 1989 ... and Approved (Step II) by the Worcester County Commissioners.... Revised Step II approved in 2001.

Written marketing material for The Point's Reach Condominium consisted of seven pages, the first of which states that The Point is "Located on the Isle of Wight Bay and Manklin Creek at the Point Ocean Pines." The third page, entitled "the Point, Ocean Pines," describes The Point community, stating it is a **"new community" "comprised of 124 single family homes with traditional American Seaside Architecture and 75 luxury bayfront condominiums."** (Emphasis added.) On the same page, under the heading "Condo Ownership Costs," is listed the "Monthly Condo Dues" (which vary depending upon the type of unit) **and**

*Homeowners Association Dues:*
The Point—$150 annually
Ocean Pines Association—$545 annually.

The other pages include the various layouts for the units and a professional drawing of the three buildings that comprise the Condominium.

The 2004 Condo Declaration was amended on September 13, 2005 ("2005 Condo Declaration") and recorded the same day, together with Condominium Plat Three, which covers Phase Three of the Condominium, *i.e.,* the third building, consisting of 27 units. Condominium Plat Three contains the same language quoted above regarding the property being part of and subject to the Isle of Wight/Turville Creek PUD. A Second Amended Condominium Declaration was made on May 1, 2006 ("2006 Condo Declaration"), and was recorded in the Land Records with Condominium Plat Two, dated April 22, 2006, covering Phase Two of the Condominium, *i.e.,* the second

building, consisting of 21 units. Condominium Plat Two contains the same language we have quoted. When the three buildings were fully constructed, they contained 75 condominium units. None of the amendments to the Condo Declarations included any mention of the HOA.

### *Trial Testimony*

The Condominium called William Iampieri, who testified that on October 26, 2004, he and his wife purchased a unit in the Condominium from Banker's, for whom Mr. Meinhardt appeared at settlement. The Iampieris, who live in Howard County, are real estate professionals and they purchased their unit as an investment. Mr. Iampieri acknowledged that, before purchasing the unit, he had received the Seller's Disclosure and other written materials that provided, among other things, that The Point is comprised of 124 single-family homes and 75 luxury bay-front condominiums and that unit owners would be responsible for paying annual dues of $150 to The Point HOA. He conceded that he knew, therefore, that he was buying a property in the community called The Point, that upon purchasing his unit he would be obligated to be a member of The Point HOA, and that he would have to pay dues assessed yearly by The Point HOA. He identified his HUD–1 settlement sheet, which shows that, at closing, he and his wife paid $29.04 as *pro rata* dues owed to The Point HOA. Mr. Iampieri stated that for years, he received The Point HOA dues notices and paid the dues.

Mr. Iampieri testified that he is aware that there are streetlights along Ocean Parkway and landscaping in that area and assumes that The Point HOA pays for that. He was shown the projected stabilized budget document for the HOA and agreed that the amount of dues charged by the HOA to the unit owners of the Condominium is based on a total HOA membership of 199, and that that number is the sum of 124 single-family lots and 75 condominium units. He acknowledged receiving and reviewing the Seller's Disclosure and attached documents prior to purchasing his unit.

Brian Carney testified as an owner of one of the Condominium units and also as the designated representative of the Condominium. Mr. Carney is an investment banker. He and his wife purchased their unit on October 22, 2004. They do not live there full-time. During the summer, his wife and children live in the unit and Mr. Carney visits on weekends. The family's primary residence is in Baltimore County.

Mr. Carney acknowledged receiving the "Seller's Disclosure" and attached documents prior to settlement on his unit and testified that all the Condominium unit purchasers would have received those documents before their purchases. He bought his unit from Banker's, without the involvement of a real estate broker. He stated that he agrees that the HUD–1 settlement sheet for the closing on his unit shows that, in addition to making a payment to the Condominium's own HOA, he and his wife made a *pro rata* payment of the annual dues to The Point HOA. He complained, however, that the Condominium unit owners do not receive any benefit from belonging to The Point HOA.

Mr. Carney testified that he saw the written sales materials for the Condominium before purchasing his unit and that he understood that he was going to be buying property in a community comprised of 124 single-family homes and 75 condominium units. He stated that he knew before he bought his unit that there were condo ownership costs and that they included the $150 annual fee to The Point HOA. He acknowledged that the HOA's projected stabilized budget for The Point, as included in the materials he received in advance of settlement, assumed 199 members, each paying $150 annually, for a total of $29,850. He also acknowledged that the Condominium has had unit owners serve as officers and directors of The Point HOA. Mr. Carney agreed that the written Rules and Regulations of the Point's Reach Homeowners Association, drafted in 2005 and posted on the Condominium's website as late as 2010, state that "Point's Reach [the Condominium] is part of the Ocean Pines Homeowners Association and The Point Homeowners Association."

Mr. Carney went on to testify that on September 13, 2010, he signed a letter on behalf of the Board of Directors of the Point's Reach Condominium Homeowners Association that was sent to all unit owners. The letter informed the unit owners that the Board had concluded that they were not part of The Point HOA and was recommending that the unit owners not pay annual dues to The Point HOA. Since then, some unit owners have paid dues to The Point HOA, but most have not.

Leonard Nemec, the Condominium's last witness, testified briefly. He purchased his unit in late September 2005, through a trust, and lives in it. At closing he paid a *pro rata* amount of dues owed to The Point HOA. He was of the view that, once the roads in the community were dedicated over to Ocean Pines, which then took responsibility for maintaining them, belonging to The Point HOA was of no benefit to the Condominium unit owners. He complained that at a meeting of the Board of Directors of The Point HOA on October 31, 2009, the original Bylaws for the HOA (dated October 13, 2005) were amended to expressly state that the Condominium units are part of The Point HOA, and that this was done without a vote of the membership, but only based on a vote of the Board.

The Condominium moved into evidence the deeds for units sold by Banker's to purchasers from October 11, 2004, through March 27, 2007. All of the deeds, either by their language or by exhibits attached to them, state that the unit is being purchased subject to the Condominium Master Deed or Declaration, including by-laws, dated October 8, 2004, and recorded in the Land Records, and any amendments thereto (with the dates of the amendments identified depending upon the date of the sale). Some of the deeds also state that the unit is taken subject to the 1999 Declaration. None of the deeds state that the unit is taken subject to the 2000 Declaration. One deed, dated October 7, 2005, states that it is taken "SUBJECT, HOWEVER, to covenants, restrictions, easements and rights-of-way of record."

The HOA called Mr. Meinhardt as its first witness. He testified, as the documents we have discussed show, that when Banker's purchased Section 17 of Ocean Pines from Balfour, Balfour already had obtained approval for a PUD for Section 17 that would consist primarily of single-family homes, with an area of multi-family townhouses to be located in the interior of Section 17, in what was labeled Parcel A. To go to settlement with Balfour, Banker's used the first two phases of Balfour's original plan and bonded for the infrastructure. After settlement, Banker's started selling home sites. (As noted, a few sites previously had been sold by Balfour.) For its Plats, Banker's used Phases 1, 1A, 2A, and 2B simply because they were the phases of the PUD that already had been reduced to plats by Balfour. Mr. Meinhardt stated, with respect to the Condominium:

Phase 3 sort of generically was our bayfront land, future development parcel which we were working on plans and design work for what became Point[']s Reach Condominium, and we had essentially relocated the townhomes that were located on the interior of the site [in the Balfour plan], we made that a park.

Mr. Meinhardt explained that he wrote the marketing material for The Point, including the sentence: "This new community is comprised of 124 single family homes with traditional American Seaside Architecture and 75 luxury bayfront condominiums." He stated that the sentence reflected his "intention regarding the community," which never varied. He further testified that he intended that the cost of owning a unit in the Condominium would include payment of The Point HOA annual dues, which is why that cost was included in the marketing material for the Condominium units and in the Seller's Disclosure.

With respect to The Point HOA, which, as noted, was created in the 2000 Declaration, Mr. Meinhardt testified that "there needed to be an umbrella organization on behalf of all the residents to manage and maintain all the common areas, street lights, the park areas, entrance features." He included the HOA in the 2000 Declaration because, as the developer of

the community, he "needed to create the obligation of all the property owners within the section to pay their association dues for the benefit of the community services, the upkeep of the common areas." He was asked on direct examination, "What was your intention with regard to coverage, this homeowner's association, what was the extent of this homeowner's association intended to be?" Mr. Meinhardt answered: "It was to have 199 members representing 124 single family homes and 75 condominiums."

Mr. Meinhardt emphasized in his testimony the June 1, 2000 letter from Ms. Wimbrow reporting approval of the Revised Step II Plan for the PUD. As noted, that plan depicts the three-building Condominium, precisely as it later was built, describing it as "Phase 3" of The Point. Mr. Meinhardt explained that in developing Section 17 of Ocean Pines, he always had intended that the Point's Reach Condominium would be located on the Isle of Wight waterfront and would be part of The Point.

Mr. Meinhardt further testified that he drafted the 1999 and 2000 Declarations and the August 21, 2003 Seller's Disclosure, all of which were given to every purchaser of property of any sort in Section 17. He stated that, in the 2000 Declaration, he had intended the word "Section" to mean Section 17 of Ocean Pines, which was the land on which all building would take place—single family homes **and** multi-family condominium units. He also drafted the stabilized budget for The Point HOA, which was based on The Point HOA's having 199 members, i.e., 124 single-family home members and 75 Condominium unit members. Mr. Meinhardt testified that, to him, the word "Lots," as used in the "WHEREAS" clause in the 2000 Declaration, meant existing single-family houses, future single-family houses, and all multi-family units. Thus, the word "Lot" was meant to encompass any lot in Section 17, including units in the Condominium to be built in the future Phase 3.

At that point in Mr. Meinhardt's direct examination, in response to another question by counsel for the HOA about

what Mr. Meinhardt had intended certain language in the 2000 Declaration to mean, counsel for the Condominium objected on the ground that the meaning of the language was clear on its face and therefore extrinsic evidence of the drafter's intent was precluded by the parol evidence rule. Counsel for the HOA responded that the intention of the declarant, *i.e.*, Banker's, was relevant to its affirmative defense of implied reciprocal negative covenant, citing case law to this effect.

The trial court found the language to be ambiguous, ruling as follows:

> [T]here is a level of ambiguity present and [the court] will permit the questions to [Mr. Meinhardt] .... The reason [the court] believes there is a level of ambiguity present is because there—the documents are replete with references to not just the lots which are the 124, there are also [references to] a total of 199 units. There needs to be an explanation on the record of what that meant in terms of how that number applies when the written language does not reference necessarily the condominium units.

Mr. Meinhardt then proceeded to testify that in drafting the 2000 Declaration, it was his intention that the units in the planned Condominium were "Lots" within the meaning of that word, as used in the 2000 Declaration. When questioned about the use of a capital "L" to describe the Lots subject to the restrictions in the 2000 Declaration, Mr. Meinhardt replied that his intention was that the word "Lots" "represented all residential property that was going to be sold to the general public." He pointed out that the section of the 2000 Declaration concerning design expressly refers to design criteria for single-family residences *and* multi-family units.

He further explained that the reason the land was described generally as "Section 17" in the 2000 Declaration was because **all** of Section 17 was "referred to as The Point at Ocean Pines. And Section 17 included the single family homes and the condominiums and the clubhouse for that matter." When asked why the 2000 Declaration identifies Phases 1, 1A, 2A, and 2B (the single family home phases) but does not identify

Phase 3 (the Condominium phase), Mr. Meinhardt responded that

the word Section 17 is what is amplified or otherwise generally known as The Point. It was my intent as the person who drafted this that the Section be inclusive of—not be simply—not narrowed by the preceding phrase which just simply recites the phases that were on record at the time.

Mr. Meinhardt also was asked whether the purchasers of Condominium units had "actual notice of the fact that they were going to be subject to the [2000 Declaration]?" He responded that all purchasers of condominium units were "given a copy of the [S]eller's [D]isclosure" that included the 2000 Declaration as an exhibit and clearly stated that purchasers of condominium units would have to pay dues to the condominium's own HOA and to The Point HOA (and to the OPA).

On cross-examination, Mr. Meinhardt was asked why he wrote the 2000 Declaration to say "that the restrictions apply only to the lots and not [to] say they apply to the lots and the future property—future developable property owned by the declarant." He answered: "I thought I said that." He explained that it was not his intention in "drafting" the 2000 Declaration that "Lots" would mean only those lots shown in Phases 1, 1A, 2A, and 2B; rather, it was his intention that "Lots" included all residential property in The Point to be sold to the general public, including the Condominium units. When asked why the First Condo Declaration, filed in the Land Records in 2004, made no reference to The Point HOA, Mr. Meinhardt said he was "not so sure [he] would have thought it needed to go in there."

The HOA's second and final witness was John Nesbit, who purchased a single-family residence lot in The Point in February 2001 and built a house on it in the summer of 2004. At the time of trial, Mr. Nesbit was President of the HOA. He testified that the HOA takes care of all common elements in the community for all 199 units, including landscaping, mow-

ing, utilities for street lights, and other administrative costs. He stated that he knew from the time he purchased his lot, in early 2001, that The Point would consist of all the single-family residences and multi-family units built and to be built on Section 17, and that the HOA would cover all development within Section 17.

Counsel for the parties argued their contrary theories of the case in closing.

At the close of the evidence and after oral arguments, the court adjourned, and directed counsel to appear the following day for the court's ruling. The next morning, the court ruled from the bench, resolving the case in favor of the HOA. The judge stated (reiterating his prior ruling) that extrinsic evidence was relevant and admissible because the 1999 and 2000 Declarations are ambiguous and because case law about restrictive covenants looks not only to the recorded instruments but also to the intention of the grantor when he conveyed the property to others or reserved some of it for his own use. Referring to *Roper v. Camuso*, 376 Md. 240, 829 A.2d 589 (2003), the judge explained:

The doctrine of implied negative reciprocal covenants recognizes at least under certain circumstances that when a common grantor develops land for sale in lots, pursues a course of conduct indicating an intention to follow a general plan or scheme of development with respect to the land and imposes substantially uniform restrictions on the lots conveyed, those same restrictions may be enforced against the land retained by the common grantor if the land is found to be part of the general plan of development and the buyers purchased their lots with that understanding. Three condominium owners testified during the trial of this case that they purchased their respective properties from the developer, they viewed promotional materials prior to their purchase as well as the declarations of the developer regarding the restrictions applicable to the property. They acknowledge being aware of the statements contained in the materi-

als of their purchase including an obligation to membership in the Defendant.

\* \* \*

The developer proceeded on his plan of creating single and multifamily units by joining plats and preparing declarations on his intentions regarding the properties. He subdivided the section he purchased into 124 single family lots. He also described his intention to eventually create a multifamily unit that fronted on the desirable waterfront view portion of the development that would maximize the use of the land. His general scheme was to make all the properties subject to membership in the homeowner's association he would create. The purpose of that association was to maintain the common area of the development not subject to individual ownership of the buyers of the lots or units.

\* \* \*

[The developer] clearly announced the intention to create a single, all-inclusive homeowner's association to maintain the common areas for the benefit of the homeowners in the community. He divided the property into 124 individual lots and a larger parcel for the 75 units. His general scheme reflected that all were subject to ... the covenant of membership in [the HOA].

... [E]ach purchaser knew or should have known prior to settlement and knew at settlement ... that the covenant of membership was part of ownership of the property in the development. The Court believes the covenant is part of the restrictive encumbrances that came with ownership in the development and applies to all parties whether described as single family or condominium units in nature.[8]

Having concluded that the Condominium is part of The Point and the unit owners must be members of The Point HOA, the court denied them all the relief they had requested.

---

8. In his ruling, the judge assessed the testimony of each witness and further analyzed the law of the doctrine of implied negative reciprocal covenants. We have quoted only a part of the judge's extensive ruling.

## DISCUSSION

## I.

### DID THE TRIAL COURT ERR IN FINDING THAT THE CONDOMINIUM UNIT OWNERS ARE BOUND BY THE 2000 DECLARATION THAT REQUIRES MEMBERSHIP IN THE HOA?

#### *Ambiguity/Extrinsic Evidence*

As explained, the HOA was created in the 2000 Declaration. The circuit court found the language of that declaration to be ambiguous as to whether the Restrictions the 2000 Declaration imposes apply to all owners of property in Section 17, including the Condominium unit owners, or only to owners of single-family residential properties. The court allowed extrinsic evidence to be admitted relevant to the intentions of the parties to that declaration, primarily the drafter, Mr. Meinhardt.

The Condominium contends the trial court erred in its ambiguity finding. It argues that the language of the 2000 Declaration controls, and that that language plainly establishes that the Condominium unit owners are not governed by the Restrictions in that document, including the obligation to belong to the HOA. In particular, it asserts that, in the 2000 Declaration, "only the land described as Phase 1, Phase 1A, Phase 2A, and Phase 2B of Section 17 in Ocean Pines is burdened by the restrictions" and the subject of the 2000 Declaration is the single family lots, with "the word 'condominium' . . . not even mentioned." It points out that for the most part the type of restrictions imposed demonstrate they would not apply to Condominium units—*e.g.,* rules about garages' locations, front yards, roofs, and mailboxes.

The HOA counters that the trial court correctly found that both the 1999 and the 2000 Declarations are ambiguous and, on that basis, properly admitted extrinsic evidence of the intentions of the parties, in particular, Mr. Meinhardt, who was the developer and drafted the documents. It points out

that the 1999 Plat identified the land on which the Condominium later was built as being "remaining lands of Banker's Development, LLC reserved for future development." The 2000 Declaration provides at Section 1 that the restrictions apply "to Lots only and are specifically excluded from application to other property in the Section," and, at Section 4A, also states, on the same page, that: "Lots shall be used only for those single-family residential **or** multi-family residential purposes set forth herein." (Emphasis added.) The HOA argues that this language makes the meaning of "Lots" unclear, and therefore the scope of application of the Restrictions in the 2000 Declaration unclear. The HOA emphasizes that the 1999 Declaration states that "all of the real property described in the Plats comprises Section 17" but the 2000 Declaration—which it maintains did not supplant the 1999 Declaration—states "all of the real property described in the Plats comprises Phase 1, 1A, 2A, & 2B of Section 17, Ocean Pines, Worcester County, Maryland, generally known as 'THE POINT.' " It asserts that the language discrepancy in the two coexisting Declarations creates even more ambiguity.

In *Belleview Const. Co., Inc. v. Rugby Hall Community Ass'n, Inc.*, 321 Md. 152, 582 A.2d 493 (1990), the Court of Appeals explained:

> In construing covenants "[i]t is a cardinal principle ... that the court should be governed by the intention of the parties as it appears or is implied from the instrument itself." *Live Stock Co. v. Rendering Co.*, 179 Md. 117, 122, 17 A.2d 130 (1941). The language of the instrument is properly "considered in connection with the object in view of the parties and the circumstances and conditions affecting the parties and the property ...." *Levy v. Dundalk Co.*, 177 Md. 636, 648, 11 A.2d 476 (1940). This principle is consistent with the general law of contracts.... If the meaning of the instrument is not clear from its terms, "the circumstances surrounding the execution of the instrument should be considered in arriving at the intention of the parties, and the apparent meaning and object of their stipulations should

be gathered from all possible sources." *Live Stock C. v. Rendering Co., supra,* 179 Md. at 122, 17 A.2d 130.

If an ambiguity is present, and if that ambiguity is not clearly resolved by resort to extrinsic evidence, the general rule in favor of the unrestricted use of property will prevail and the ambiguity in a restriction will be resolved against the party seeking its enforcement. The rule of strict construction should not be employed, however, to defeat a restrictive covenant that is clear on its face, or is clear when considered in light of the surrounding circumstances.

*Id.* at 157–58, 582 A.2d 493 (some citations omitted).

 As the *Belleview* Court noted, the law governing the interpretation of restrictive covenant instruments comports with the general law of interpretation of contracts. *Id.* at 157, 582 A.2d 493. Under contract law, a writing (or related writings) is ambiguous when it reasonably can be read to have two different but plausible meanings. *Calomiris v. Woods,* 353 Md. 425, 436, 727 A.2d 358 (1999). When a writing is ambiguous, extrinsic evidence is admissible to determine the intentions of the parties to the document. *Prison Health Servs. v. Baltimore County,* 172 Md.App. 1, 9, 912 A.2d 56 (2006). *See SDC 214, LLC v. London Towne Prop. Owners Ass'n,* 395 Md. 424, 434, 910 A.2d 1064 (2006) (observing that when "the language of the instrument containing a restrictive covenant is unambiguous, a court should simply give effect to that language," but if the meaning is not clear from the language, the intention of the parties should be gleaned from all possible sources showing the circumstances surrounding the execution of the instrument) (citing *Belleview,* 321 Md. at 157–58, 582 A.2d 493); *Sy–Lene of Wash., Inc. v. Starwood Urban Retail II,* 376 Md. 157, 163, 829 A.2d 540 (2003) (stating that parol evidence is admissible to show the meaning of contract language only after the court has found the contract language to be ambiguous). "The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law, subject to *de novo* review." *Sy–Lene,* 376 Md. at 163, 829 A.2d 540. *See also Cochran v. Norkunas,* 398 Md. 1, 16 n. 7, 919 A.2d 700 (2007).

■ As noted, the 2000 Declaration, entitled, "REVISED AND RESTATED DECLARATION OF RESTRICTIONS THE POINT SECTION 17—OCEAN PINES PHASES 1, 1A, 2A & 2B," states in its opening paragraph that it is entered into between Banker's, as the Declarant, and the "Lot Owners" listed in Exhibit A. Those Lot Owners do not include any Condominium unit owners—nor could they, as construction of the first Condominium building did not begin until several years later.

The language in the first two WHEREAS clauses is clear and provides essentially the same thing, which is that the Declarant is the owner (or authorized representative of the owners) of all the real property set forth in the Plats (incorporated by reference) for Phases 1, 1A, 2A, and 2B of Section 17, and that Section 17 as a whole is "The Point" development. The third WHEREAS clause explains that the phrase "the Lots," as used in the 2000 Declaration, means "subdivided single-family detached numbered residential Lots . . . set forth and described in the Plats," that the Declarant intends to sell to the general public; and that apart from the Lots there is "the remaining property in the Section consisting of future phases for residential Lots" that the Declarant also intends to sell. This language is clear that "the Lots" are the numbered single family home lots depicted in the Plats for Phases 1, 1A, 2A and 2B of Section 17. That is, "the Lots" are *a part* of Section 17, and in particular are the part of Section 17 on which single-family homes will be built in the areas depicted in the Plats.

The fourth WHEREAS clause also is clear. It states that the Declarant intends to subject *"the Lots "* to restrictions, covenants, etc., referred to collectively as "Restrictions," pursuant to a general scheme that will be of benefit to the entire Section, that is, The Point development as a whole. (Emphasis added.) The WHEREAS clauses go on to state the "Lot Owners" join in subjecting "their Lots" to the Restrictions. The Declaration then imposes the Restrictions on all "the Lots," further stating that they shall be held, conveyed, etc., subject to the Restrictions.

What is already clear in the introductory clauses of the 2000 Declaration is repeated in its first numbered paragraph, entitled "Application," which states that "These Restrictions shall apply to Lots only and are specifically excluded from application to other property in the Section and depicted on the Plats as roadways and open space...." The use of the capitalized "Lots" in the applicability paragraph makes plain that the Restrictions apply to the Lots identified in the Plats that depict Phases 1, 1A, 2A, and 2B of Section 17 (again, consistent with the previous paragraph imposing the Restrictions).

The language of the 2000 Declaration thus makes clear that "the Section" and "The Point" are one and the same—all of Section 17 of Ocean Pines—and that the parties to that declaration are Banker's and the Lot Owners in Phases 1, 1A, 2A, and 2B of The Point, which does not include the Condominium units because they are not a part of any of those Phases. The Plats show that the land by the Isle of Wight Bay is retained by Banker's and reserved for future development. (In fact, the Condominium, as planned when the PUD was approved and as eventually built is Phase 3 of The Point.)

Nevertheless, there is language in the 2000 Declaration that is not clear with respect to The Point HOA and with respect to multi-family units, of which there are none in Phases 1, 1A, 2A, and 2B of The Point. The language in paragraph 12B that creates the HOA is more general than any of the preceding language that specifically applies to "the Lots." Significantly, paragraph 12B states that "[e]very owner of property **within the Section** shall be required to join the Homeowners Association...." As noted, "the Section" means all of Section 17, which is the entirety of The Point development, not just "the Lots" in Phases 1, 1A, 2A, and 2B. And paragraph 12E further provides that "[a]ny amenity areas and improvements in the Section devoted to the exclusive use and benefit of residents of The Point shall be maintained by Declarant or a Homeowners Association **consisting of all owners of properties within the Section** as established [by paragraph 12B]." (Emphasis added.)

Because they are parties to the 2000 Declaration, the owners of lots in Phases 1, 1A, 2A, and 2B are bound by its Restrictions, including the requirement to belong to the HOA. The Condominium unit owners are not parties to the 2000 Declaration. Yet, paragraph 12B of that Declaration unequivocally requires that **all** owners of property in Section 17—not limited to the owners of properties in Phases 1, 1A, 2A, and 2B—**shall** belong to the HOA, and paragraph 12E states that all amenities and improvements in Section 17 devoted to the exclusive use and benefit of property owners in The Point (*i.e.*, Section 17), shall be maintained by Declarant or an HOA "consisting of all owners of properties within the Section."

Moreover, although the owners of "the Lots"—which does not include the Condominium—are the parties to the 2000 Declaration, and all of those Lots are restricted to single-family residential homes, the 2000 Declaration includes several references to multi-family homes. In paragraph 4A, "Lots" are to be used only for "those single-family residential or multi-family residential purposes set forth herein, on the Plats"; but the Plats only depict lots on which single-family residences will be built. The review fees set forth in Paragraph 6E, pertaining to the Architectural Review Committee of the OPA, state that fees for "residential products other than single-family . . . may be established from time to time by Declarant." Paragraph 7E expressly addresses design standards for multi-family dwellings, stating that they "shall be consistent with the architectural design theme and shall be subject to criteria to be established by Declarant." Finally, with exceptions not relevant here, paragraph 13A provides that every person who acquires title "to any Lot in the Section shall become a member of the OPA"; and paragraph 13D sets forth the means by which the OPA calculates its annual charges including for OPA members who own condominium units.

We conclude that notwithstanding that the provisions of 2000 Declaration are in most respects clear, the relationship between the provisions is not clear. As the most obvious example, the impact, if any, of the broad language of the HOA

required membership provision on the parties to the 2000 Declaration and future lot owners in The Point is unclear. For this reason, we conclude that the trial court did not err in ruling that the 2000 Declaration is ambiguous, and in allowing extrinsic evidence to be admitted on the issue of the intent of the parties, especially Banker's, as the common grantor.

### Implied Negative Reciprocal Covenants

The lack of clarity in the 2000 Declaration is such that may give rise to circumstances in which the doctrine of implied negative reciprocal covenants could apply—as the trial court found it did. Before analyzing that question, we shall review the three seminal Maryland cases addressing the doctrine: *Turner v. Brocato,* 206 Md. 336, 111 A.2d 855 (1955), *Schovee v. Mikolasko,* 356 Md. 93, 737 A.2d 578 (1999), and *Roper v. Camuso,* 376 Md. 240, 829 A.2d 589 (2003).

In *Turner,* in 1927, a developer purchased a 47–acre tract of land, some of which fronted on Falls Road. The developer recorded a plat for a residential subdivision he planned to build on the tract, named Poplar Hill. The plat showed three sections: A, with 38 lots; B, with 37 lots; and C, in part adjacent to Falls Road, with no lots. The developer sold the first lot, in Section A, subject to restrictions listed in the deed, including that the lot only could be used for residential purposes and not for commercial use, and that the restrictions only would apply to lots in Section A, and not to lots retained by the developer. The restrictions were known as the "Poplar Hill Restrictions," and were to run with the land for 50 years. *Id.* at 340, 111 A.2d 855. Soon after selling the first lot in Section A, the developer sold the first lot in Section B, and included in that deed the Poplar Hill Restrictions. Then, as the developer sold additional lots in Sections A and B, the deeds for those lots made reference to and incorporated the Poplar Hill Restrictions.

Two years later, the developer sold the first lot in Section C, incorporating in it the Poplar Hill Restrictions. At some point before then, the developer had ceased, with a few exceptions, including any express reference to the Poplar Hill Restrictions

not applying to land retained by him. In 1930, the developer prepared a revised plat that was not recorded and did not refer to any of the Sections. In the land that had been Section C, the revised plat showed 12 new numbered lots and a "finger of land" that was unnumbered and bordered about 500 feet on Falls Road. *Id.* at 341, 111 A.2d 855. The developer sold the numbered lots in what had been Section C, with the Poplar Hill Restrictions in the deeds, leaving only the "finger of land" unsold. The developer divided the "finger of land" into three parts, selling two and keeping one for himself. The deeds to the two parts that were sold did not contain the Poplar Hill Restrictions.

In 1953, Brocato purchased one of the parts of the "finger" of land to use as a dry cleaning establishment. Turner and other Poplar Hill lot owners sued Brocato for declaratory and injunctive relief, asserting that, even though Brocato's deed did not include the Poplar Hill Restrictions, the restrictions nevertheless applied to his property. The case went to trial, and the circuit entered a declaratory judgment in favor of Brocato.[9]

The Court of Appeals reversed, invoking the doctrine of implied negative reciprocal easements (or covenants). The Court explained that proof of a common plan or scheme of development can give rise to an inference that restrictions imposed in the deeds for most of the properties in the development were for the benefit of all who purchased property in the development from the grantor; and therefore, consistent with the intent of the grantor, the restrictions could be enforced against the owner of a property whose deed did not

---

**9.** The evidence at trial revealed that the third "finger of land" parcel—the one that was not retained by the developer and was not eventually purchased by Brocato—had for years been used for a parking lot for an adjacent store that was located on land that was not in the Poplar Hill development; but that the residents of Poplar Hill had not realized that the land on which the parking lot was located was part of Poplar Hill. Under the circumstances, the residents did not object to the owner of that parcel continuing to use it as a parking lot for the adjacent store.

include them. Quoting *Schlicht v. Wengert,* 178 Md. 629, 634, 15 A.2d 911 (1940), the Court explained:

[I]n the absence of express promises in the conveyances that the restrictions were intended to be for the common benefit and advantage of vendees and subvendees: " * * * it is incumbent upon a party seeking enforcement to show an unexpressed intention by inference from the nature of the plan and development and the purpose of the restriction, or, in other words, from the circumstances. It would be incorrect to say that the absence of an expression of the intention is decisive. And *it would be incorrect to say that any ground of valid inference must be disregarded.* An inference which appears with sufficient clearness from any source should be accepted."

*Turner,* 206 Md. at 351, 111 A.2d 855 (emphasis added in *Turner* ).

Observing that the case was not one in which "the only evidence of a general plan [wa]s the imposition of restrictions in each deed," the Court concluded that the Poplar Hill residents had "met the burden of proof as to a general plan of development by clear and satisfactory evidence." *Id.* at 352, 111 A.2d 855. That evidence included that for 20 years, the sign advertising Poplar Hill as a restricted residential development had stood on the very lot at issue; that numerous Poplar Hill residents testified that they would not have purchased their lots had they thought that any lot in the community was exempt from the restriction against commercial use; similar testimony that two of the "finger" lots always had been regarded as part of the residential community; that all of the "finger" lots were shown on the plats as part of the Poplar Hill development; and testimony by the sales agent that the restrictions were a selling point and that most of the buyers would not have made their purchases if they had thought the restrictions did not apply to all of the properties in the development. The evidence also showed that Brocato was on notice of the Poplar Hill Restrictions.

The Court held that, on that evidence, there was a common plan or scheme of development that permitted an inference that the "Poplar Hill Restrictions," included in all of the deeds except Brocato's and two others, were for the benefit of the entire Poplar Hill community and were intended by the developer, as the grantor of all the lots, to apply to all lots in the community, including Brocato's lot.

*Schovee,* 356 Md. 93, 737 A.2d 578, was decided many years later, in 1999, which, as the Court pointed out, was light years away from *Turner* in terms of zoning and subdivision planning and development laws. In *Schovee,* a developer subdivided 168 acres into 25 lots, with each to be a minimum of three acres. When the subdivision plat was filed, the developer recorded a "Declaration of Covenants, Easements, Conditions, and Restrictions" that stated that it applied to lots 1–5 and 8–25, thus excluding lots 6 and 7. *Id.* at 95–96, 737 A.2d 578.[10] The restrictions provided that the lots could not contain more than one detached residential structure. The developer sold 23 of the lots (all but numbers 6 and 7) by deeds that attached the declaration, made specific reference to it, and stated that the covenants were to run with the land for 40 years, and then would be automatically renewed for 10–year periods.

The dispute in *Schovee* involved lot 7. The defendant, who was the vice-president of the developer, purchased that lot and then took steps to combine it with lot 8, which he also owned, and to subdivide it. The other lot owners filed suit, alleging that lot 8 plainly was subject to the restrictions and, notwithstanding that lot 7 was not covered by the declaration, they had been led to believe that lot 7 was part of the general community and therefore was subject to the same restrictions set forth in the declaration as their lots were. Summary judgment was granted in favor of the other lot owners as to lot 8. At the conclusion of the trial, in regard to lot 7, the court applied the doctrine of implied negative reciprocal covenants, ruling that the evidence established an intent on the part of

10. Lot 6 was not owned by the developer but was required to be included on the subdivision plat.

the developer to create a common plan for the community that would prohibit the building of more than one residence on less than three acres of land, and that, even though the declaration did not cover lot 7, the restrictions imposed on the 23 lots subject to the declaration likewise applied to lot 7.

The case ultimately was heard by the Court of Appeals, which reversed. Based on the holding in *Turner*, the Court summarized the doctrine of implied negative reciprocal covenants as follows:

[A]t least under certain circumstances, ... when a common grantor develops land for sale in lots, pursues a course of conduct indicating an intention to follow a general plan or scheme of development with respect to the land, and imposes substantially uniform restrictions on the lots conveyed, those same restrictions may be enforced against the land retained by the common grantor if that land is found to be part of the general plan of development and the buyers purchased their lots with that understanding.

356 Md. at 99–100, 737 A.2d 578. Observing that the function of the doctrine "is to serve as a basis for subjecting land not otherwise burdened by them to restrictions applicable generally throughout a planned development," *id.* at 112, 737 A.2d 578, the Court provided historical context:

[The doctrine] arose before the advent of comprehensive zoning in order to provide a measure of protection for those who bought lots in what they reasonably expected was a general development in which all of the lots would be equally burdened and benefitted. In those early days, it was uncommon for the developer to evidence the development or impose uniform restrictions through a recorded Declaration that would later be incorporated in individual deeds. They often filed subdivision plats of one kind or another but did not take the extra step of using one instrument to impose the restrictions. The common, almost universal, practice, instead was for the developer to place the restrictions in the deeds to individual lots and, sometimes, to represent to the purchasers of those lots that the same restrictions would be placed in subsequent deeds to

the other lots. Litigation arose most frequently when the developer then neglected to include the restrictions in one or more of the subsequent deeds and those buyers proceeded or proposed to use their property in a manner that would not be allowed by the restrictions.

*Id.* at 107–108, 737 A.2d 578.

With the function and history of the doctrine in mind, the *Schovee* Court explained that when "land is expressly subjected to restrictions by an instrument forming part of its chain of title, the doctrine [of implied negative reciprocal easements] would ordinarily have no application, for there is no reason to *imply* a burden that is already *expressly* imposed." *Id.* at 112, 737 A.2d 578 (emphasis in the original). So,

[t]he interplay between the doctrine and an instrument (or combination of instruments) that both creates the uniform restrictions and delineates the land subject to them arises only with respect to land not expressly included under the instrument and then only from the implication that, by delineating the land included under the instrument, the grantor intended that the restrictions apply only to that land and to no other. **It is in that context that we may characterize such an instrument as presumptive evidence of the grantor's intent—a presumption that the grantor did not intend for the restrictions to apply to any land not expressly included.** The presumption, in that sense, creates the prospect of opposing implications—an implied intent on the part of the grantor that *all* land included, or represented as being included, within a general development be subjected to uniform restrictions established as part of that general development *versus* an implied intent on the part of the grantor that land not delineated in the instrument creating the restrictions not be subject to those restrictions, either because that land is not to be regarded as part of the general development or, if it is, that it nonetheless is not to be burdened by the restrictions.

*Id.* (Emphasis added.) Ordinarily,

[a]bsent some compelling circumstance, purchasers cannot be allowed to claim ignorance of that which is clearly set

forth in a recorded instrument in the chain of title to their respective lots, especially when that instrument (1) is actually given to them, and (2) is specifically referred to in their contracts of sale and deeds.

*Id.* at 112–113, 737 A.2d 578.

The Court did not go so far as to hold that the doctrine of implied negative reciprocal covenants never will apply when there is a recorded declaration. It recognized that "there may be instances in which the developer, through its conduct, creates a basis for implying restrictions to retained land that was not included in the Declaration." *Id.* at 113, 737 A.2d 578. However,

[w]hen the developer uses such an instrument to create the restrictions and define the land subject to them . . . that instrument is not merely a piece of evidence, to be viewed with other evidence in determining whether there was a general plan of development and what property is subject to the restrictions imposed on that development. The instrument ordinarily suffices to establish both facts.

*Id.*

The Court concluded that the Declaration, together with the language in various of the deeds, plainly established that the developer did not intend to subject lot 7 to the restrictions imposed on all the other lots (except lot 6); and that there was no evidence adduced to show that the developer's conduct was inconsistent with lot 7 not being subject to the restrictions. The Court observed that given the plain language of the Declaration and the integration clauses in their contracts of sale, there was no reason for the purchasers of the lots covered by the Declaration to reasonably believe that lot 7 was part of the community and therefore would be subject to the restrictions imposed upon lots 1–5 and 8–25. Thus, the "presumption of non-inclusion of Lot 7" was not rebutted. *Id.* at 114, 737 A.2d 578.

Finally, in *Roper*, 376 Md. 240, 829 A.2d 589, the Court of Appeals considered whether the doctrine of implied negative reciprocal covenants applied to one lot in a residential subdivi-

sion, so as to make that lot subject to the same covenants that plainly applied to all the other lots in the same subdivision. As the lots were created and sold, the deeds to all (except one) had attached to them written covenants that, among other things, limited the height of any fences or shrubberies to be placed on the property, except with the permission of the Architectural Control Committee, and the deeds and attached covenants were recorded in the land records. When Roper purchased her lot from the developer, she did so by deed that, like all the other deeds to lots in the subdivision, stated that it was " 'subject to the covenants and restrictions of record.' " *Id.* at 243, 829 A.2d 589. However, no written covenants or restrictions were attached to Roper's deed or recorded with it.

Roper maintained that her lot was subject to the covenants, under the doctrine of implied negative reciprocal covenants, notwithstanding that the covenants were not attached to her deed or recorded with it. As the Court pointed out, the posture of the case was somewhat unusual. The doctrine usually is invoked by grantees, whose properties were conveyed expressly subject to certain covenants, when those grantees are seeking to have the same covenants apply to properties of other grantees, whose properties were not conveyed expressly subject to those covenants. Roper was seeking application of the doctrine to have her property made subject to the covenants that the other properties in the subdivision all were subject to. Her goal was to have standing to enforce the covenants against Camuso, her neighbor, which she would not have if her property were not subject to the covenants itself. So, although the posture was unusual, the primary question the case raised was, like in *Turner* and *Schovee*, whether the doctrine operated to apply restrictions to a property within a subdivision that was not expressly subject to the restrictions.

The *Roper* Court explained that

[t]he seminal prerequisite for asserting that an implied negative reciprocal covenant exists is a common grantor who has a general plan of development for the land. If a general plan of development exists establishing certain re-

strictions on property use, those restrictions could be enforced in equity. We stated in *Turner* that "the jurisdiction of equity to enforce certain rights in respect of land is not necessarily dependent upon technicalities which are so important at law." A court's primary interest in equity is to give effect to the actual intent of the grantor. In such context, we do so by looking not only to language in deeds, but variously to matters extrinsic to related written documents, including conduct, conversation, and correspondence.

\*　　\*　　\*

[T]he Maryland cases considering implied restrictions on land retained by a common grantor have turned on two key inquiries: whether (1) there was a general plan of development, and (2) if so, the retained land was intended to be a part of the development . . . ."

> If in such a case it appears that it was the intention of the grantors that the restrictions were part of a uniform general scheme or plan of development and use which should affect the land granted and the land retained alike, they may be enforced in equity; that the covenants creating the restrictions are to be construed strictly in favor of the freedom of the land, and against the person in whose favor they are made; and that the burden is upon one seeking to enforce such restrictions, where they are not specifically expressed in a deed, to show by clear and satisfactory proof that the common grantor intended that they should affect the land retained as part of a uniform general scheme of development.

376 Md. at 261–62, 829 A.2d 589 (quoting *McKenrick v. Savings Bank,* 174 Md. 118, 128, 197 A. 580 (1938) (other citations omitted)).

In *Roper*, there was no dispute that four of the five "elements" of the implied negative reciprocal covenants doctrine, as derived from the holding in *Turner*, had been satisfied: a common owner had subdivided property into a number of lots for sale; the common owner had an intention to create a general scheme of development for the property as a whole, in

which the use of the land was unrestricted; the vast majority of the subdivided lots contained restrictive covenants reflecting the general scheme; and the purchaser of the lot in question (Roper) had actual or constructive notice of the condition. The only "element" in dispute was whether the property against which the application of the implied covenant was sought—Roper's property—was intended to be part of the general scheme of development. *See id.* at 249–50, 829 A.2d 589 (listing elements), and 269 (defining the dispute before it). The Court held that, unlike in *Schovee,* in which the language of the Declaration made clear that the lot in dispute was not subject to the covenants, and there was no extrinsic evidence to rebut the presumption that the common grantor intended otherwise, the language in Roper's deed was unclear, in that it stated that the lot was being conveyed "subject to covenants and restrictions of record," but there were no covenants or restrictions recorded with it. *Id.* at 272, 829 A.2d 589.

Concluding that the deed was insufficient to show the intent of the grantor, the Court reviewed the extrinsic evidence relevant to whether Roper's lot was intended by the common grantor "to be part of the community and subject to the covenants." *Id.* That evidence showed that the development was planned as "a residential community of open spaces with panoramic views and as an equestrian community with bridal paths running along the rear of many properties"; that the written covenants had been recorded with the deeds to all of the lots, except Roper's; that according to the developer, the covenants "were meant to be enforced by either the developer or the grantees" and were to benefit the community and the purchasers bought their lots in part because of the covenants; that Roper and her neighbors thought the covenants applied to her lot; that Roper purchased her lot in part because of the view and the bridal paths, which the covenants were meant to secure; and that the Architectural Review Committee created by the covenants had in the past contacted Roper and made clear that its members viewed her lot as being subject to the covenants. *Id.* at 272–73, 829 A.2d 589. The Court pointed out that there was no evidence that the developer intended

that the covenants not apply to Roper's lot and, if her lot were the only one in the entire development not to be subject to the covenants, that would undermine the common plan that existed for the development and would be "contrary to the stated purposes of the covenants." *Id.* at 273, 829 A.2d 589. The Court determined that, on this evidence, under the doctrine of implied negative reciprocal covenants, "[t]he trial court erred by not finding Ms. Roper's lot to be subject to the covenants." *Id.*

## *Analysis*

We return to the record in the case at bar. The Condominium contends the cases discussed above are inapposite because each concerns a single lot, or a very small number of lots, left unrestricted within a large development in which the other lots were subject to the covenants in question. It maintains that the Condominium is not part of a unified subdivision development, but is its own separate subdivision development. It asserts that, unlike the usual implied negative reciprocal covenant cases, which involve use restrictions, the restriction at issue here has nothing to do with use; it only has to do with membership in the HOA and payment of dues/fees imposed by the HOA. The Condominium further maintains that the trial court erred by not applying an initial presumption, under the holding in *Schovee,* that Banker's did **not** intend the Condominium unit owners to be bound by the 2000 Declaration, as they were not parties to it; and that the evidence was insufficient to rebut that presumption, both substantively and because the evidence came into being after the drafting and recordation of the 2000 Declaration. Finally, the Condominium argues that it is inequitable to apply the doctrine of implied negative reciprocal easements to conclude that the 2000 Declaration requires the unit owners to be members of the HOA because the unit owners do not derive any benefit from belonging to the HOA.

The HOA responds that the evidence rebutted any presumption that the Condominium unit owners were not bound

by any aspect of the 2000 Declaration, as it satisfied all five elements of the implied negative reciprocal covenant test: Banker's, as the common grantor, subdivided all the property in Section 17 of Ocean Pines, *i.e.,* "The Point," for sale, including the single family lots and the condominium units; Banker's intended to create a general scheme of development and common plan for The Point, as a subdivision; virtually all of the single family residential lots, which comprise part of The Point, were conveyed subject to the 2000 Declaration, which created restrictive covenants, including required membership in the HOA for every owner of property in The Point, all of which protect the general scheme and common plan for The Point; Banker's intended that the Condominium would be part of the general scheme and common plan of development for The Point; and the purchasers of the Condominium units had actual notice of the covenant requiring them to belong to the HOA at the time they made their purchases.

■ As a threshold matter, we do not agree with the Condominium's assertion that the doctrine of implied negative *reciprocal covenants only can be applied to covenants restrict-* ing the use of property. To be sure, the three seminal cases discussed above all concern restrictions on use: *Turner*— restriction against commercial uses on lots; *Schovee*—restriction on use of lots to build more than one residence; and *Roper*—restriction on the height of fences and shrubbery on lots. In *Bright v. Lake Linganore Association, Inc.,* 104 Md.App. 394, 656 A.2d 377 (1995), this Court recognized that a covenant requiring property owners within a community to pay assessments to a homeowners association, for the maintenance of common facilities of benefit to the development as a whole, can be enforceable "as covenants that are part of a general plan of development of which [the property owner] had notice." *Id.* at 433, 656 A.2d 377. Likewise, some of the older cases involving the doctrine, cited in the three seminal cases we have discussed, concerned design, not use, restrictions. *See, e.g., Peabody Heights Co. of Baltimore City v.*

*Willson,* 82 Md. 186, 32 A. 386 (1895).[11] Thus, the mere fact that the covenant at issue here concerns the obligation to belong to The Point HOA does not mean that the doctrine of implied negative reciprocal covenants cannot apply.

In advancing its arguments, the Condominium urges that *Schovee* controls this case, because it is the only Maryland case in which application of the doctrine of implied negative reciprocal easements was considered in the face of a recorded declaration of covenants, as opposed to in the face of restrictions included in recorded deeds. We agree that *Schovee* is highly relevant, for that very reason, but note, as discussed above, that the *Schovee* Court did not go so far as to hold that the doctrine could never be applied when the restriction(s) at issue were included in a recorded declaration. We also note that the declaration in *Schovee* was absolutely clear that lot 7 was not subject to the limitation on the number of residences on a lot; the declaration was straightforward and involved only 25 total lots in a non-phased community, not a much larger number of lots developed over time and in phases; and that, even looking beyond the plain and unambiguous language of the declaration, there was no evidence whatsoever to rebut the presumption that the common grantor did not intend to accomplish exactly what the language of the declaration accomplished—to exclude lot 7 from the restrictions.

Although the principles set forth in *Schovee* apply to this case, the facts here differ greatly; and it is in light of the lack of clarity of the 2000 Declaration, which we have explained, and those significantly different extrinsic facts, that we must assess whether the trial court correctly applied the doctrine of implied negative restrictive covenants to rule that the Condominium was subject to the 2000 Declaration, and, more precisely, to the requirement in that declaration that all owners of property in The Point belong to the HOA.

---

11. The Peabody Heights development was built in the 1890s, on land in the central city north of North Avenue, which recently had been annexed. Over time, the neighborhood stopped being called Peabody Heights. In 1967, the neighborhood was renamed Charles Village. www.charlesvillage.net/about.php (last visited Aug. 8, 2013).

The history of the Isle of Wight/Turville Creek PUD, which, as we have recounted, extends back to 1989, shows that Banker's (and its predecessors in title) intended and received approval to develop **all** of Section 17 of Ocean Pines as "The Point," and that The Point was to be developed (and in fact was developed) in three distinct phases—the first two consisting of 124 single-family homes and the third consisting of 75 multi-family units, which ultimately took the form of the Condominium. There is no evidence that Banker's intended to develop the single-family residences and the condominium buildings as two separate subdivisions, as the Condominium argues. Indeed, the evidence is directly to the contrary. As discussed, *supra*, at note 3, under the zoning laws that governed PUDs at the relevant time, once the Isle of Wight/Turville Creek PUD was fully developed, it became a single major subdivision.

The 2000 Declaration contains multiple references to the Section, *i.e.*, The Point, and the plan to develop it as one community. The Plat attached to that declaration that shows the land where the Condominium buildings later were built is marked, "Remaining lands of developer," and the declaration states in its WHEREAS clauses that the developer intends to sell that remaining property as future phases of residential lots and amenities, etc. The declaration further provides that the various Restrictions are imposed "under a general plan or scheme of improvement for the benefit and complement of all of the Lots **in the Section and the Subdivision**" (emphasis added), which only can mean all of Section 17, which, as explained, is The Point. So, although the parties to the 2000 Declaration consisted only of Banker's and the lot owners in Phases 1 and 2 of The Point, the declaration contained language from which the purchasers in Phases 1 and 2 would expect that there was to be a future phase (or phases) of The Point as part of the PUD and that The Point would be fully developed as a single subdivision in which all of the property owners would be required to belong to the HOA and therefore would be required to pay the HOA assessments, in order to fund the shared costs of the community (such as the electrical

costs for the streetlights throughout). So, those who purchased lots in The Point before the Condominium units were built and sold held reasonable expectations that the Condominium units, when completed, would be the multi-family Phase 3 of The Point and that the unit owners would belong to the HOA and contribute dues as the other HOA members were.

As we have noted, the "Seller's Disclosure" was given to every purchaser of a Condominium unit. That disclosure made plain that "The Point" was the entirety of Section 17. The disclosure included the 2000 Declaration that contains the language requiring all property owners in The Point to belong to the HOA. The disclosure also clearly states at paragraph 4 that The Point will be comprised of 124 single-family lots in Phases 1, 1A, 2A, and 2B together with future multi-family lots in subsequent phases, which was what the construction and sale of the Condominium units then became. Moreover, the disclosure attached the projected annual stabilized budget for the HOA that showed that all of the properties—single-family and multi-family—would belong to the HOA and would contribute $150 per year in dues, which would produce $29,850, and further showed what that money would be used, in particular, for electricity for street lights, landscaping and lawn care in the common areas, including the entrance to The Point, and reserves for future repairs and contingencies. The Condominium shares a common entrance with the rest of The Point and, to get to the waterfront area of The Point where the Condominium is located, one must traverse the streets on which the street lights are located. Thus, the $150 per year HOA dues were being used for the benefit of all of the property owners in The Point, both single-family residence owners and Condominium unit owners.

The sales materials the unit owners received made it absolutely clear that the Condominium was part of The Point. Not surprisingly, all of the unit owners who testified at trial acknowledged that they knew, when they purchased their units, that they were required to belong to the HOA. There was no confusion on their part. At their settlements, they

paid the *pro rata* portion of that year's HOA dues, which only happened because they knew they were becoming members in the HOA upon purchasing their condominium units. Then, in the years that followed, they paid the HOA dues in full, annually. They only stopped doing so upon being advised by lawyers with whom certain unit owners had consulted that they were not required to belong to the HOA.

On this set of facts, which is essentially undisputed, we conclude that all the elements of the doctrine of implied negative reciprocal covenants were satisfied and that any presumption that existed based on the ambiguities in the 2000 Declaration, and the fact that the unit owners were not parties to that declaration, was strongly rebutted. The Point, being all of Section 17 of Ocean Pines, was held and sold in phases, as approved through the formation of a PUD, by Banker's, as the common grantor for all of the phases. The PUD approval and formation was the equivalent, under the applicable zoning laws, of the creation of a single subdivision, and the PUD was built out, phase by phase, with the intention of creating a plan and general scheme of development for Section 17 of Ocean Pines, to be known as The Point. The vast majority, if not all, of the lots in The Point, are subject to the same restrictive covenants, in particular, that their owners belong to the HOA and pay dues assessed by the HOA, for the common good of the community, and the Condominium buildings were intended to be a part of the general scheme of development of The Point, being Phase 3 of the single subdivision the PUD eventually became.

Finally, both the purchasers of the single family lots in Phases 1, 1 A, 2, and 2B of The Point, and the purchasers of the Condominium units, which comprised Phase 3 of The Point (with all of those phases together constituting the entire community of The Point) had actual notice that the every lot owner in The Point would be required to belong to the HOA and pay the dues it assessed. As noted, the testimony was uniform that the Condominium unit owners made their purchases with actual notice that they were required to belong to

the HOA and that they were paying the *pro rata* amount of dues that were owed, as HOA members, at settlement.

Accordingly, on this evidence, the trial court properly applied the doctrine of implied negative reciprocal covenants to find that the restriction in the 2000 Declaration requiring membership in The Point HOA applies to the Condominium owners as well as to the other lot owners in Section 17/The Point.

## II.

### DID THE TRIAL COURT ERR IN FAILING TO RULE ON THE QUESTION WHETHER THE HOA HAS THE AUTHORITY TO ASSESS FEES AND, IF IT SO RULED, IN REACHING THAT CONCLUSION?

The trial court found that the 2000 Declaration created The Point HOA and that membership in that HOA created an "obligation to pay dues." Nevertheless, the Condominium contends that the court did not address this issue; and if it did, the finding was in error, because the 2000 Declaration did not confer "express" authority on the HOA to assess dues. It specifically argues that the definition of "declaration" in Md. Code (1974, 1996 Repl.Vol., 2000 Supp.), section 11B–101(d) of the Real Property Article ("RP"), requires a declaration to outline the structure of fee assessments that a homeowners association is authorized to make. Here, the 2000 Declaration refers to Article 11B of the Real Property Code but does not include such an express authorization. The Condominium directs our attention to *Woodland Beach Property Owners' Association v. Worley*, 253 Md. 442, 252 A.2d 827 (1969), for the principle that a fee cannot be assessed by a homeowners association when there are no documents creating the authority to assess that fee. It likewise cites *Campbell v. Lake Hallowell Homeowners Association*, 152 Md.App. 139, 831 A.2d 465 (2003), in support.

The HOA responds that this issue is not preserved for review because it was neither raised nor decided below. *See* Md. Rule 8–131(a). On the merits, the HOA asserts that

paragraph 12B of the 2000 Declaration in fact expressly confers authority upon it to assess fees, and that it was the intention of Banker's, as the common grantor and declarant, to grant the HOA that authority. The HOA maintains that neither case cited by the Condominium is helpful to the disposition of this issue.

■ There is no merit in the HOA's preservation argument. Ordinarily, this Court will not decide a non-jurisdictional issue on appeal unless it was raised in or decided by the trial court. Md. Rule 8–131(a). In this case, in opening statement, counsel for the Condominium asserted that the HOA "is not authorized to assess its members." He cross-examined Mr. Meinhardt and Mr. Nesbit extensively on the issue. At the close of the evidence, in a colloquy with the court, he stated that the threshold issue in the case was whether the Condominium unit owners must belong to the HOA but that a second "even probably more important[ ]" issue was whether the HOA has "the authority to assess its members." As noted, the trial court addressed the latter issue in its oral ruling, stating: "The Court concludes that [Condominium unit owners] were properly considered members of the [HOA] and the obligation to pay dues is part of their participation as members." Accordingly, the question whether the HOA has authority to assess fees not only was raised in the trial court, which alone would preserve it for review, but also was decided by the trial court.

■ We turn to the merits of the issue. As we have discussed, paragraph 12B of the 2000 Declaration provides that "[e]very owner of property within the Section shall be required to join the Homeowners Association entitled 'The Point Homeowners Association.' " It then states:

The formation of, and obligations of the members of, the Homeowners Association shall be as set forth in the provisions of Title 11B of the *Real Property* Article of the Annotated Code of Maryland. **The provisions of the assessment structure and provisions for the collection of assessments of the Homeowners Association shall [ ] be**

**as set forth in Article 11B of the Real Property Article
as aforesaid.**

(Emphasis added.)

The definition of "Declaration" in RP section 11B–101(d) reads, in relevant part, as follows:

(1) "Declaration" means an instrument, however denominated, recorded among the land records of the county in which the property of the declarant is located, that creates the authority for a homeowners association to impose on lots, or on the owners or occupants of lots, or on another homeowners association, condominium, or cooperative housing corporation any mandatory fee in connection with the provision of services or otherwise for the benefit of some or all of the lots, the owners or occupants of lots, or the common areas.

We disagree with the Condominium that the language of the 2000 Declaration is insufficient to authorize the HOA to assess fees. To be sure, paragraph 12B is not well written. Title 11 B of the Real Property Article does not, as pertinent here, provide a payment structure for fees, so the portion of paragraph 12B stating that "[t]he provisions of the assessment structure and provisions for the collection of assessments of the Homeowners Association shall [ ] be as set forth in Article 11B of the Real Property Article" is not helpful in guiding how assessments are to measured and collected. That same language makes, clear, however, that the HOA has the authority to assess fees. If it did not, there would be no reason to reference any mechanism for assessment and collection. So, poorly written as it is, paragraph 12B of the 2000 Declaration nevertheless is sufficient to give the HOA the authority to assess fees from its members.

The cases cited by the Condominium do not advance its arguments. In *Worley,* 253 Md. 442, 252 A.2d 827, a waterfront community formed in the 1930's created a homeowner's association for the purpose of maintaining the common waterfront property used by the lot owners. There was no language in any of the deeds to the lots at any time, or in the

document creating the homeowners association, that gave the association any "right to collect any sum, equitable or otherwise, from the lot owners." *Id.* at 449, 252 A.2d 827. Here, as we have explained, the pertinent language in the 2000 Declaration could have been better crafted, but has the effect of authorizing the HOA to assess fees.

*Campbell,* 152 Md.App. 139, 831 A.2d 465, is not supportive either. It concerned whether the correct procedure had been followed to amend a declaration of covenants to allow the community's homeowners association to obtain legal fees incurred as the result of a dispute between the association and a lot owner/member. After such a dispute, the trial court awarded the homeowners association attorneys' fees. On appeal, we vacated that judgment, holding that the association had not followed the proper procedure for adopting the amendment to the declaration that allowed it to obtain attorneys' fees. In the case at bar, the language of the 2000 Declaration was sufficient to empower the HOA to assess fees against its members.

## III.

### DID THE TRIAL COURT ERR BY NOT MEMORIALIZING ITS DECLARATORY JUDGMENT IN WRITING?

As noted, the evidence phase of the trial took place on June 23, 2011, and on June 24, 2011, counsel returned to the courtroom and the court rendered its ruling from the bench. The ruling is thorough, comprising 13 ½ pages of transcript. The court addressed all of the issues raised in the case, including ambiguity (which also was addressed by the court during the trial, when extrinsic evidence was offered), the intention of the common grantor, and the nature of the doctrine of implied reciprocal negative covenants and its application to the case. The trial court concluded that the Condominium unit owners are required to be members of the HOA and therefore must pay the dues the HOA assesses, thus resolving Count I in favor of the HOA and against the

Condominium. On that basis, the court further found in favor of the HOA and against the Condominium on Counts II and III, in which the unit owners had sought a permanent injunction and repayment of dues previously paid. A form judgment in favor of the HOA was signed by the clerk of court and entered that day.

After completing his on-the-record ruling, the trial court "ordered" counsel for the HOA "to submit an Order reflecting the Opinion and Ruling of the Court." On June 27, 2011, the HOA's attorney prepared a proposed Order and sent it to counsel for the Condominium for review. The next day, June 28, counsel for the Condominium responded that the proposed Order was satisfactory to him. That same day, counsel for the HOA emailed the proposed Order to the judge, with a message that it had been approved by both counsel.

On June 29, 2011, the trial court signed the proposed Order. The Order states that the case was tried on the three-count complaint; summarizes the allegations and relief sought in the complaint; and continues,

having heard and carefully considered the testimony of witnesses and received and reviewed documentary evidence presented by the parties as well as argument of counsel on June 23, 2011 **and for the reasons stated in its oral opinion in open Court on June 24, 2011,** it is this 29th day of June, 2011:

ORDERED:

1. That [the Condominium's] Claims for Relief in Counts I, II, and III of their Complaint are denied in their entirety;

2. That the Clerk is directed to enter judgment in favor of [the HOA] pursuant to Rule 2–601 denying all relief;

3. That costs are awarded against [the Condominium]; and

4. That a copy of this Order be mailed to counsel of record.

(Emphasis added.) The Order was entered on June 30, 2011.

No post-judgment motions were filed. On July 22, 2011, the Condominium noted this appeal. In this Court, no prehearing

conference was held and on October 6, 2011, the transcript of the June 23 and 24, 2011 proceedings was filed.

The Condominium's final contention is that the declaratory judgment should be reversed and remanded because the trial court erred by not preparing a proper written declaration of the rights of the parties, *i.e.*, that the oral ruling from the bench was not a proper declaration of the parties' rights as it was not written and the Order signed by the trial judge, although a writing, did not adequately declare the rights of the parties. The HOA responds that the Condominium waived this issue for appeal, because it agreed with the wording of the proposed Order in advance of its being signed by the trial judge. The HOA argues that, even if the issue was not waived, it does not warrant a reversal of the declaratory judgment because it is not a jurisdictional defect and this Court has discretion to review this appeal on the merits and remand for the entry of an appropriate declaratory judgment order if one is needed. In its reply brief, the Condominium maintains that the issue needs to be reviewed and an appropriate declaratory judgment order entered because it is imperative that current and future owners of units in the Condominium be on record notice of their rights and obligations, including the obligation to belong to the HOA, which is not stated expressly in the 2000 Declaration.

In *Union United Methodist Church, Inc. v. Burton*, 404 Md. 542, 948 A.2d 1 (2008), the Court of Appeals quoted at length from its prior opinion in *Bowen v. City of Annapolis*, 402 Md. 587, 937 A.2d 242 (2007), as follows:

"This Court, on numerous occasions, has reiterated that 'whether a declaratory judgment action is decided for or against the plaintiff, there should be a declaration in the judgment or decree defining the rights of the parties under the issues made.' *Case v. Comptroller*, 219 Md. 282, 288, 149 A.2d 6, 9 (1959); *accord Bushey v. Northern Assurance Company of America*, 362 Md. 626, 651, 766 A.2d 598, 611 (2001); *Ashton v. Brown*, 339 Md. 70, 87, 660 A.2d 447, 455 (1995); *Christ v. Maryland Dep't of Natural Resources*, 335 Md. 427, 436, 644 A.2d 34, 38 (1994). To do otherwise we

have held is error .... In *Allstate Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 363 Md. 106, 117 n. 1, 767 A.2d 831 (2001), we explained this requirement further:

> "[W]hen a declaratory judgment action is brought and the controversy is appropriate for resolution by declaratory judgment, the court must enter a declaratory judgment and that judgment, defining the rights and obligations of the parties or the status of the thing in controversy, *must be in writing.* It is not permissible for the court to issue an oral declaration.... *When entering a declaratory judgment, the court must, in a separate document, state in writing its declaration of the rights of the parties.... Although the judgment may recite that it is based on the reasons set forth in an accompanying memorandum, the terms of the declaratory judgment itself must be set forth separately* ...." (Some interior citations omitted.)

*Bowen*, 402 Md. at 608–09, 937 A.2d at 254–55.

404 Md. at 549–50, 948 A.2d 1 (emphasis in *Bowen* ).

In *Burton*, a declaratory judgment action, the trial judge made an oral ruling from the bench and stated that he intended it to be his judgment. Right then, he asked the court reporter to transcribe the ruling. Apparently, the trial judge received the transcript before he rendered a written judgment, but he rendered the written judgment "without incorporating [the transcript] or signing or in any way indicating that the transcript had been reviewed or that the court approved of it." 404 Md. at 551, 948 A.2d 1. When the case came before the Court of Appeals, that Court observed,

> There is no written indication that the trial judge read the transcript. The trial judge, in his written order, does not inform the parties (or this Court) that he has read the transcript, and thus checked it for accuracy, i.e., that his oral judgment was accurately transcribed. Without that information, it cannot be transformed into a written judgment. It is no more than a court reporter's transcript of an oral opinion. Therefore, it is not elevated to the status of a "separate written document."

Additionally, the trial judge ordered that the "rights of the parties are declared in the oral opinion." This Court and the Court of Special Appeals . . . have stated repeatedly that judgments rendered under the Declaratory Judgment Act may not be oral, but must be made in writing. Even if it were possible to transform a transcript of an oral opinion and judgment by signing and expressly adopting each page of a transcript and by specifically incorporating it, and attaching the signed transcript, in a subsequent "separate" written judgment, the action in the instant case was insufficient.

*Id.* at 553–54, 948 A.2d 1. The Court went on to review the merits of the appeal, however, and then directed that the court render the appropriate judgment on remand.

■ In the case at bar, the transcript of the trial court's June 24, 2011 oral ruling was not ordered prior to the entry of the June 30, 2011 Order, and therefore it is clear that the trial judge did not review it prior to signing the Order, and could not have incorporated it into the Order. Although the Order resolved the claims for relief in Counts I, II, and III of the complaint by stating that they were decided in favor of the HOA, it did not include a declaration of the rights of the parties. Notwithstanding that the trial court's oral ruling in fact declared the rights of the parties, the law is clear that, in a declaratory judgment action, the court must enter a separate written order declaring the rights of the parties. That was not done here.

■ For several reasons, however, this case is one in which we have determined that it is appropriate to address the issues presented, notwithstanding the defect in the court's Order, and that the defect easily can be corrected on remand after affirmance by an amendment to the Order. The Condominium had an opportunity, before the proposed Order was submitted to the court and after the court signed it, to bring to the court's attention that the Order as drafted and then as signed did not declare the rights of the parties, as a declaratory judgment order must do. In fact, the Condominium did the

opposite, approving the proposed Order in advance and then not filing a post-judgment motion after the Order was entered.

We do not consider these actions/non-actions a waiver, as the requirement that the rights of the parties to a declaratory judgment action be stated in the court's final order serves not only to inform the parties of their rights but, especially in cases involving real property rights, to put others on notice of the rights being declared. However, the Condominium's failure to object to the proposed Order or to move to amend it after it was entered militates against our waiting to decide the issues before us until a proper order is entered. Indeed, the very reason the Condominium gives in support of its argument that it is important, in this case, for the Order to declare the rights of the parties, so that present and future Condominium unit owners will know that they are obligated to pay fees assessed by the HOA, strongly favors our present resolution of the merits of the issues raised on appeal.

Furthermore, there is no assertion by either party on appeal that the transcript of the court's oral ruling does not accurately reflect the ruling that was made or that there is any misunderstanding about the nature of the court's decision, as embodied in its oral ruling. The court decided that the Condominium unit owners are required to belong to the HOA and pay the assessments the HOA imposes on its members. The Order entered by the court easily can be amended to so state. Accordingly, we shall affirm the judgment of the circuit court with the instruction that it amend the June 30, 2011 Order to include the following language:

> Point's Reach Condominium unit owners are required to be members of The Point Homeowners Association, Inc., and must pay the assessments that that homeowners association charges its members.

**JUDGMENT AFFIRMED. CASE REMANDED TO THE CIRCUIT COURT FOR WORCESTER COUNTY FOR THE LIMITED PURPOSE OF AMENDING THE JUNE 30, 2011 ORDER IN ACCORDANCE WITH THE**

284

INSTRUCTION IN THIS OPINION. COSTS TO BE PAID BY THE APPELLANTS.