REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 300

September Term, 2013

PINEY ORCHARD COMMUNITY
ASSOCIATION, INC.

v.

PINEY PAD A, LLC, *et al.*

Zarnoch,
Nazarian,
Wallace, Sean D.
　　　　　(Specially Assigned),

JJ.

Opinion by Nazarian, J.

Filed: January 29, 2015

* Judge Timothy E. Meredith and Judge
Kevin F. Arthur did not participate, pursuant
to Md. Rule 8-605.1, in the Court's decision
to report this opinion.

"Men's arguments often prove nothing but their wishes."
Charles Caleb Colton

This case involves a parcel of land and covenants that, on their face, don't apply to that parcel. The Piney Orchard Community Association, Inc. ("the Association") seeks to overcome the omission by arguing that the historic plan for the Piney Orchard community ("Piney Orchard") contemplated restrictions to the uses of the parcel that apply through indirect or equitable avenues. The owners of the parcel, appellees Piney Pad A, LLC and Piney Pad B, LLC (collectively "Piney Pad"), sought a declaratory judgment that the covenants did not apply, and the Circuit Court for Anne Arundel County granted Piney Pad's Motion for Summary Judgment. The Association complains on appeal that it was wrongfully denied the opportunity to develop and submit evidence in support of its claims. Our decision to affirm the judgment for Piney Pad is as much about summary judgment, and the burden a party bears when opposing a motion for summary judgment, as it is about covenants.

## I. BACKGROUND

Piney Orchard is a planned community near Odenton, Maryland. It covers more than three square miles and consists of about "4,500 apartments, condominium units, townhomes, and single family homes." The Association is "a condominium association that manages" Piney Orchard. The community includes a small retail shopping center with some commercial businesses located next to the development's community center, indoor pools, and fitness center. The parties describe this part of Piney Orchard—seemingly its commercial hub—as the "Village Center," and the property at issue in this litigation (the "Property") sits next to it.

The Property was originally part of the land owned by the Piney Orchard Master Partnership ("POMP"), but now is owned by Piney Pad. The configuration and ownership of the Property has evolved over time and it has been designated with various lot numbers over the course of many plat filings,[1] but for present purposes two undisputed details matter:

1.    The Property was part of original Parcel 5; and

2.    The Property consists of the portions of original Parcel 5 now known as Lot 4RRR and Lot 9R.

Portions of the broader Piney Orchard community are subject to either of two sets of covenants. The *first*, which POMP (as Declarant) recorded on January 10, 1990, is the "Declaration of Covenants, Conditions and Restrictions" (the "POCA Declaration").

---

[1] Here is the step-by-step history (we need not and do not attempt to explain the nomenclature or the rationale for each of these steps):

On January 12, 1989, POMP subdivided part of Piney Orchard into Parcels 1 through 11. Then-Parcel 5 included the Property.

On June 28, 1989, POMP subdivided Parcel 5; one part of that subdivision, Parcel 5A, included what are now Lots 4RRR and 9R.

On April 30, 1992, POMP subdivided Parcel 5A into Lots 1 through 6; lots 4, 5, and 6 included what are now Lots 4RRR and 9R.

On September 6, 1995, POMP combined then-lots 4 and 5 into Lot 4R and created Lots 7 and 8 out of part of Lot 6. The remainder of Lot 6 included what is now Lot 9R.

On August 1, 1997, POMP subdivided Lot 6 and Lot 3A, with the remainder of Lot 6 (including what later became Lot 9 and is now Lot 9R) becoming Lot 6R.

On September 25, 1997, POMP subdivided Lots 1, 2, 3, 4R and 6R into lots 1R, 2R, 3R, 4RR, and 6RR; Lots 4RR and 6RR included what are now Lots 4RRR and 9R.

On July 7, 2004, POMP subdivided Lot 6RR into Lots 6RRR and Lot 9; Lot 9 included what is now lot 9R.

On November 30, 2004, POMP conveyed title to Lot 4RR and Lot 9 to Piney Pad via Special Warranty Deed. The deed did not mention the POCA Declaration.

On July 12, 2012, Piney Pad redesignated Lot 4RR as Lot 4RRR, and Lot 9 as Lot 9R.

2

Counsel for Piney Pad described the POCA Declaration at the hearing on the Summary Judgment Motion (the "Hearing") as the "residential declaration." Generally speaking, the POCA Declaration "subject[ed] the Property described on Exhibit A attached hereto to the covenants, liens, easements, conditions and restrictions set forth and established herein in order to preserve the aesthetic qualities of the community."[2] Much of Piney Orchard is governed now by the POCA Declaration, but at the outset *only then-Parcel 6* was subject to it.[3] The POCA Declaration made plain that it was a general plan, and expressly was "not intended to limit [POMP] with respect to the use or type of development or pattern of development for any particular parcel of property within Piney Orchard."

The POCA Declaration also provides that other Piney Orchard properties could be brought within its reach by "recording in the Land Records of Anne Arundel County Supplemental Declarations containing a description of such additional property and expressing an intent to subject such additional property to the terms of this Declaration and such additional covenants, liens, easements, conditions or restrictions as may be appropriate thereto[.]" In Article III, § 2, the POCA Declaration explains how its definition of "Property"

---

[2] The POCA Declaration sets limits on the uses and design of properties, limits dwellings to single-family homes, regulates lawn maintenance, trash collection, and the like, provides for annual dues assessment, and establishes an Architectural Review Board.

[3] Exhibit A to the POCA Declaration described Parcel 6 in detail, and even though the plat map also included Parcel 5 (which included what ultimately became Lots 4RRR and 9R), the Association does not dispute that the POCA Declaration encompassed only Parcel 6. The Association admitted in its Answer the contents of Paragraph 11 of the Complaint, which stated that "only Parcel 6" fell within the POCA Declaration, and it has not contended otherwise on appeal.

3

can expand to encompass properties added in that manner: "[A]dditional property may be annexed to the Property and made subject to this Declaration by the recordation of a 'Supplemental Declaration' containing a description of such additional property and also containing any other appropriate covenants, conditions or restrictions applicable to such property to be annexed."[4] And POMP understood how to accomplish such an annexation: between 1991 and 2006, it recorded over fifty Supplemental Declarations that subjected new developments within Piney Orchard to the POCA Declaration.

A *second* and separate series of documents addressed and circumscribed the commercial uses of the Village Center:

- On December 13, 1995, POMP recorded a Declaration of Covenants, Conditions and Restrictions (the "1995 Village Center Declaration") for the Village Center, which had been approved by Anne Arundel County as a "planned commercial complex." The 1995 Village Center Declaration laid out detailed limitations governing, among other things, building height, utility pipe location, parking, and signage. The Property was not included in the parcels listed as covered by this declaration.

- On October 3, 1997, POMP recorded an amended and restated Declaration (the "1997 Village Center Declaration"), which was the same in substance as the 1995 Village

_____

[4] Article I, § 20, in turn, defined "'Supplemental Covenants' and 'Supplemental Declaration'" to mean

> any Supplemental Declaration of covenants, conditions and restrictions which may be recorded by a Developer or [POMP], relating to all or some portion or part of the Property. [POMP] may authorize a Developer to record such Supplemental Covenants by execution thereof indicating such consent. No Supplemental Covenants shall be effective without such execution and consent by [POMP].

4

Center Declaration. It added Lots 4RR and 6RR (which later became Lots 4RRR and 9R, the Property at issue here) by defining the subject property to include them.

- On October 21, 2010, Piney Pad recorded a First Amendment to the 1997 Village Center Declaration (the "First Amendment") that purported to "de-annex" Lots 4RR and 9 from "[t]he operation, effect, covenants, liens, easements, conditions and restrictions of the 1997 [Village Center] Declaration."

Whether the Property is subject to the 1997 Village Center Declaration is a matter of dispute.

On October 15, 2012, Piney Pad filed a Complaint and Motion for Summary Judgment in the circuit court, seeking a declaratory judgment that the Property was not subject to the POCA Declaration.[5] According to the Complaint, the "clear and unambiguous language of the [POCA Declaration] establishes as a matter of law that neither Lot 4RRR nor Lot 9R is subject to the [POCA Declaration]." It also pointed out that when Piney Pad first bought Lot 4RRR (at the time Lot 4RR) and Lot 9R (then Lot 9), the "Special Warranty Deeds" conveying the lots "did not contain any mention of the application of the POCA Declaration" to the Property. Although Piney Pad also argued that the First Amendment had the effect of "de-annexing" the Property from the 1997 Village Center Declaration, it did not seek any specific declaratory relief relating to that Declaration.

The Association opposed the Summary Judgment Motion. Although the Association did not dispute that the Property fell outside the group of parcels defined in the POCA Declaration, it contended that the Property had been reserved for commercial development,

---

[5] On November 15, 2012, NVR, Inc. ("NVR") filed a Motion for Leave to Intervene as of Right, because it had an interest in the Property as its putative purchaser (from Piney Pad). The Court granted the motion on February 4, 2013.

5

that Piney Pad's attempt at de-annexation by way of the First Amendment was ineffective, and therefore that the Property still fell under the auspices of the 1997 Village Declaration. It also seemed to argue that if the court determined that the Property was no longer subject to the 1997 Village Center Declaration, the Property instead was subject to the residential requirements of the POCA Declaration. The Association cited to a handful of notations in subdivision filings over the years (by both POMP and Piney Pad) that, according to the Association, served to "put the world on notice" that the Property fell under the 1997 Village Center Declaration and the POCA Declaration.

The circuit court held a hearing on the Summary Judgment Motion on April 1, 2013. At the end of the hearing, the trial court ruled from the bench that it would issue a declaratory judgment, and later signed an Order that stated:

> neither Lot 4RRR nor Lot 9R (as described in Plaintiffs' Complaint) is subject to [the POCA Declaration, and the Association] lacks any right, now or in the future, to enforce the covenants, conditions, or restrictions set forth in the POCA Declaration against either Lot 4RRR or Lot 9R; and . . . [the Association] is enjoined from asserting any claim, at law or otherwise, relating to the use, occupancy, or possession of either Lot 4RRR or Lot 9R, or any part thereof, arising out of the POCA Declaration.

The Association filed a timely notice of appeal.

## II. DISCUSSION

The Association's position on appeal turns not on what the POCA Declaration actually says, but on what the Association contends that the POCA Declaration *meant* to say.

6

This is not a case in which the operative documents contain an ambiguity that requires us to look at the intent of the parties through extrinsic evidence—the Property is unambiguously absent from the list of parcels listed in or added to the POCA Declaration. And because neither of the Association's two appellate theories—*first*, that the court should have invoked its equitable powers to bring the Property within the POCA Declaration and *second*, that the Property's "de-annexation" from the Village Declarations could not have left the Property fully unencumbered[6]—credibly stretches the POCA Declaration to reach the Property, the circuit court correctly granted summary judgment to Piney Pad. Of course, by removing the Property from the reach of the community's covenants, Piney Pad and NVR may well have left the buyers of their proposed condominiums standing outside the proverbial community fence, looking longingly at the swimming pool and other benefits of community membership.

---

[6] We can dispense with the de-annexation argument quickly. The parties dispute whether Piney Pad ever subjected the Property to the 1997 Village Center Declaration in the first place, or later removed the Property from it. But Piney Pad never sought any relief with respect to the 1997 Village Declaration: the Complaint sought *only* a declaratory judgment that the Property is not subject to the POCA Declaration. The Association is really asking for us somehow to *compel* Piney Pad to develop the Property commercially, in keeping with what it claims were past understandings about the Property's use—but nothing in Piney Pad's declaratory judgment complaint raised that issue, nor does the circuit court's order extend that far.

To the extent the Village Declarations bear on the issue, they don't change anything—those declarations don't issue any mandates or prohibit any conduct that would affect Piney Pad's residential development of the Property. The Association cannot argue broadly that the Property *should* fall within the Village Declarations, when even if it did (an "if" we only grant here for purpose of argument), it would have no effect on residential development in the first place.

7

But be that as it may, we hold that the circuit court correctly issued, on the summary judgment posture, the declaratory judgment Piney Pad sought.

We review *de novo* a trial court's grant of a motion for summary judgment, and we construe all "reasonable inferences that may be drawn from the facts against the moving party." *Myers v. Kayhoe*, 391 Md. 188, 203 (2006). Maryland Rule 2-501 details both sides' burdens:

> **(a) Motion.** Any party may make a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law. The motion shall be supported by affidavit if it is (1) filed before the day on which the adverse party's initial pleading or motion is filed or (2) based on facts not contained in the record.
>
> **(b) Response.** A response to a written motion for summary judgment shall be in writing and shall (1) identify with particularity each material fact as to which it is contended that there is a genuine dispute and (2) as to each such fact, identify and attach the relevant portion of the specific document, discovery response, transcript of testimony (by page and line), or other statement under oath that demonstrates the dispute. A response asserting the existence of a material fact or controverting any fact contained in the record shall be supported by an affidavit or other written statement under oath.

"The purpose of summary judgment is to determine whether there are facts in dispute that must be resolved through a more formal resolution process, such as a trial on the merits. Thus, in order to defeat a motion for summary judgment, the party opposing the motion must present *admissible evidence* demonstrating the existence of a dispute of material fact." *Hines v. French,* 157 Md. App. 536, 549 (2004) (emphasis added) (citations omitted). And as we

8

explained in *Hines*, "[i]f there is no dispute of material facts, then our role is to determine whether the trial court was correct in granting summary judgment as a matter of law. . . . 'The standard of appellate review of a summary judgment is whether it is 'legally correct.'" 157 Md. App. at 549-50 (quoting *Eng'g Mgmt. Servs. v. Md. State Hwy. Admin.*, 375 Md. 211, 229-30 (2003) (citations omitted)). Moreover, it is wholly appropriate for a trial court to grant a declaratory judgment at the summary judgment stage:

> The standard of review for a declaratory judgment entered as a result of the grant of a motion for summary judgment is 'whether that declaration was correct as a matter of law.' *Olde Severna Park Improvement Ass'n, Inc. v. Gunby,* 402 Md. 317, 329 (2007) (citations omitted). We have held that '. . . it is permissible for trial courts to resolve matters of law by summary judgment in declaratory judgment actions,' *Megonnell v. United Services,* 368 Md. 633, 642 (2002).

*Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 205 Md. App. 636, 651-52 (2012), *aff'd*, 432 Md. 292 (2013).

The Association raises a number of arguments that it claims should have defeated summary judgment,[7] most ardently (and most frequently) claiming that the circuit court

---

[7] The Association presents the following three questions for our review:

1.    Did the trial court err in granting summary judgment in favor of [Piney Pad] without providing [the Association] an opportunity to offer evidence supporting its position that the doctrine of implied negative reciprocal covenants binds the property at issue in this appeal to covenants and restrictions of the planned development community within which it is located?

(continued...)

9

should have invoked its equitable powers to bring the Property within the POCA Declaration's reach. As part of this argument, the Association contends that the trial court should have looked to extrinsic evidence, and it claims that the trial court ignored disputes of fact that precluded summary judgment. In response, Piney Pad argues that the Association did not produce evidence that could overcome the Summary Judgment Motion. It also counters the Association's claim that the circuit court could (or should) have found the existence of an implied negative reciprocal easement, particularly given the lack of any ambiguity in the POCA Declaration.

## A. Absent An Ambiguity In The Covenant, The Trial Court Was Correct Not To Consider Extrinsic Evidence As To Its Scope.

Courts consider extrinsic evidence to construe contracts only when the language is ambiguous. *Newell v. Johns Hopkins Univ.*, 215 Md. App. 217, 235 (2013), *cert. denied*, 487 Md. 424 (2014). This rule applies to land covenants as well—as the Court of Appeals

---

[7](...continued)

2.      Did the trial court err in granting summary judgment in favor of [Piney Pad], thereby declaring that the subject property is not subject to the rights, obligations and restrictions set forth in the recorded POCA Declaration, when numerous documents recorded in the land records state the contrary?

3.      Did the trial court err in granting summary judgment in favor of [Piney Pad], thereby declaring that the subject property is not subject to the rights, obligations and restrictions set forth in the recorded POCA Declaration, when no supplemental declaration purporting to remove the property from the POCA Declaration regime was filed within the requisite ten-year period for doing so?

10

explained in *Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37 (2013), "[t]he language of [a] restrictive covenant is the first source to which we must look in an effort to uncover the intent of the covenanting parties; if the language of the covenant is unambiguous, it is the only source to which we look, except to confirm the plain meaning of the covenant." *Id.* at 53 (emphasis added); *see also Point's Reach Condo. Council v. The Point Homeowners' Ass'n*, 213 Md. App. 222, 255 (2013).

*Point's Reach* is the most recent in a long line of cases that have grappled with a seemingly simple problem: what to do when a member of a development or community claims that it falls beyond the reach of covenants to which the remainder of the community is subject, because that member ostensibly has been treated *differently* from the rest of the community in some way—set apart in originating documents, for example. In *Point's Reach*, a group of condominium owners located within a residential development sought a declaratory judgment that they were not subject to the development's declaration of restrictions and that they did not have to belong to (or pay dues to) the development's homeowners' association. The declaration of restrictions only brought residential (*i.e.*, non-condominium) owners specifically within its purview, but it also suggested (without stating plainly) that every owner of any property in the development had to join the homeowners' association. *Id.* at 258. We found that this conflict created an ambiguity, and we permitted the homeowners' association to introduce extrinsic evidence about the intent of the parties. *Id.* at 259.

11

Our analysis in *Point's Reach* reviewed *Turner v. Brocato*, 206 Md. 336 (1955), *Schovee v. Mikolasko*, 356 Md. 93 (1999), and *Roper v. Camuso*, 376 Md. 240 (2003), cases that addressed similar questions (and that we will discuss shortly). We ultimately concluded in *Point's Reach* that the homeowners' association had *rebutted* any presumption that the condominium owners were not a part of that declaration and restrictions. 213 Md. App. at 274. We pointed out that the development "was held and sold in phases"; that the parties intended to create a plan and "general scheme of development" in which property owners paid dues "for the common good of the community"; and that the condominium buildings "were intended to be a part of the general scheme of development." *Id.* at 274. Finally, purchasers of *both* the single-family lots *and* the condominium units had "*actual notice* that every lot owner in [the development] would be required to belong to the [homeowners' association] and pay the dues it assessed." *Id.* (emphasis added). The homeowners' association supported this finding with testimony from owners of both the single-family lots and the condominium units. *Id.*

The three cases discussed at length in *Point's Reach* presented different takes on the same question, and *Schovee* explained in detail the doctrine of negative implied reciprocal easement. That doctrine states something of a fairness principle: a grantor who sells parcels to others as part of a common development scheme is subject to the same restrictions he imposed on the other lots, even if the restrictions are not in the grantor's deed, if the buyers understood the grantor was subject to the restrictions too:

> when a common grantor develops land for sale in lots, pursues a course of conduct indicating an intention to follow a general plan or scheme of development with respect to the land, and imposes substantially uniform restrictions on the lots conveyed, those same restrictions may be enforced against the land retained by the common grantor if that land is found to be part of the general plan of development and the buyers purchased their lots with that understanding.

356 Md. at 99-100.

In *Schovee*, the original owner of an exclusive community sought to subdivide a lot within the community. He asserted that the lot was not included in the original declaration imposing restrictions on property within the community, and the other property owners within the community tried to stop him. These owners testified at trial that when they came to the community as potential buyers, the real estate broker (in some cases the owner himself) had represented to each of them that the lot at issue was part of the subdivision, and they were led to believe the lot would be subject to the same covenants and restrictions as were their own. *Id.* at 101-02.

The trial court determined that the owner's conduct fell within the doctrine of implied negative reciprocal easement: as the common grantor of the lots, he established a common scheme of development and represented to buyers that the lots in question "would be part of the common scheme," *id.* at 103, and could not be subdivided further. We reversed, holding that that the buyers failed to rebut a presumption that only the land specifically included in the declaration would be subject to its terms. *Mikolasko v. Schovee*, 124 Md. App. at 66, 82 (1998). The Court of Appeals affirmed our decision and, after surveying the doctrine in

13

detail, determined that it did not apply because the declaration at issue "establish[ed] with virtually unimpeachable clarity," 356 Md. at 113, that the owner did not intend to subject the lot to the restrictions imposed elsewhere in the subdivision, and that the purchasers of other lots knew ("at least constructively," *id.*, as the Court put it) that it was excluded.

The *Schovee* opinion analyzed *Turner*, 206 Md. 336, at some length. 356 Md. at 109-11. In *Turner*, the Court of Appeals held that the defendants' lot was part of (and subject to the restrictions within) a development and that the developer had intended to bind *all* land in the development. *Turner* relied on extrinsic evidence that ranged from promotional efforts and advertisements to language in the deeds and testimony of other buyers that, as the *Schovee* Court put it, "confirmed an intent to include all of the land within the 47-acre tract under the restrictions." 356 Md. at 111.

Following *Turner* and *Schovee*, the Court of Appeals had occasion to revisit the doctrine again in *Roper v. Camuso*, 376 Md. 240 (2003), but with an interesting twist. In that case, Ms. Roper sought to enforce community covenants against Ms. Camuso, a neighbor whose property fell expressly within them. (The twist: Ms. Roper ultimately took the position that *her* property was not bound by the community's covenants, because they were not recorded simultaneously with her deed from the developer.) Ms. Roper built a fence along the common boundary with Ms. Camuso that violated the community's covenants, and ignored letters from the community's "Architectural Control Committee" asking her to remove it. *Id.* at 244. Not to be outdone, Ms. Camuso planted a row of sixty-five Leyland

14

Cypress trees that Ms. Roper then claimed encroached on her property. When Ms. Camuso did nothing to cure the problem upon Ms. Roper's request, Ms. Roper took matters into her own hands and pruned the branches of the trees on both sides of the property. *Id.* at 244-45.

Ms. Camuso filed suit for damages and Ms. Roper counterclaimed, seeking (among other things) a declaration that the trees violated the community's covenants (along with injunctive relief). *Id.* at 245. A jury found in favor of Ms. Camuso and the trial court dismissed Ms. Roper's counterclaim, holding that she lacked standing to enforce the covenants against Ms. Camuso because her property was not subject to the covenants in the community. We affirmed, reasoning (relying on *Schovee*) that the doctrine of implied negative reciprocal easements did not apply to Ms. Roper because she was not a purchaser who asked a court "to exercise its equitable powers to impose the covenants upon a lot within the subdivision that has not been subjected expressly to the covenants." *Id.* at 249.

The Court of Appeals disagreed. The Court explained first, in keeping with *Turner*, that "the initial purpose for which the doctrine [of implied negative reciprocal easements] was developed was to provide redress for owners of lots burdened by covenants who purchased their lots believing that the common grantor intended all subsequent lots sold to be subject to the same restrictions." *Id.* at 269. The Court did not view Ms. Roper's status—a resident not subject to the covenants—as prohibiting her from seeking to enforce the doctrine. *Id.* It found sufficient evidence to support a finding that the developer intended

15

for a common plan of development to exist, and therefore that Ms. Roper could enforce the relevant covenants reciprocally. *Id.* at 270-71.

The Court looked to *Schovee* for the test: "whether (1) there was a general plan of development, and (2) if so, the retained land was intended to be part of the development." *Id.* at 261 (citing *Schovee*, 356 Md. at 106). The Court also addressed the presumptions that apply in the inquiry, and the burden on the party trying to impose the restrictions (in our case, the Association):

> [C]ovenants creating restrictions are to be construed strictly in favor of the freedom of the land, and against the person in whose favor they are made; and . . . the burden is upon one seeking to enforce such restrictions, where they are not specifically expressed in a deed, to show by clear and satisfactory proof that the common grantor intended that they should affect the land retained as a part of a uniform general scheme of development."

*Id.* at 261-62 (quoting *McKenrick v. Savings Bank*, 174 Md. 118, 128 (1938)). It concluded that Ms. Roper had produced sufficient evidence "to support the conclusion that a common plan of development existed and was intended to exist by the grantor," and that her land "was intended to be a part of that community and thence subject to, and reciprocally able to enforce, the [community's] covenants." *Id.* at 270-71. Notably, though, the evidence on which the Court relied was extrinsic to the deed itself. Preliminarily, it found that Ms. Roper's deed was ambiguous—although the deed provided that it was "'[s]ubject to covenants and restrictions of record,' no covenants or restrictions were recorded concurrently with the deed [from the developer to Ms. Roper]." *Id.* at 244. And that ambiguity in *scope*

16

justified looking to extrinsic evidence, which established that Ms. Roper's property was subject to the community's restrictions:

- *Ms. Roper* testified that *she* believed her property was subject to the covenants.[8]

- The Architectural Review Committee contacted Ms. Roper on at least two occasions informing her that she was not in compliance with the covenants, thereby expressing "an unambiguous assumption" that she was subject to the covenants.

- No evidence in the record indicated that the developer intended to exclude Ms. Roper's lot from the reach of the covenants.

- Ms. Roper's lot would have been the *only one* excepted from the restrictions if found not subject to the covenants.

*Id.* at 273.

All of these cases share the same threshold questions: *First*, whether there is any ambiguity in the documents that justifies looking to extrinsic evidence; and *second*, if there is, whether that extrinsic evidence supports an interpretation one way or the other. The cases relied on various forms of extrinsic evidence, but that evidence ultimately shared the same fundamental character—documentation or testimony showing the parties' understanding of whether and to what extent the property was meant to be encumbered:

- **Deed language**
  - In *Roper*, Ms. Roper's deed stated that it was "[s]ubject to covenants and restrictions of record." 376 Md. at 252.

_____

[8] The Court ultimately left open the possibility that Ms. Roper's claim could be barred by the doctrine of unclean hands, given that her testimony that she thought her property was subject to the covenants conflicted with her continued flouting of the community's pleas to take down her fence. *Id.* at 273-74.

- In *Schovee* (ultimately holding that the lot at issue was not subject to covenants), the Declaration "clearly" did not include the lot at issue, 356 Md. at 97, but was incorporated within the deeds of other buyers. *Id.* at 114.

- **Disclosures to buyers**
  - In *Roper*, Ms. Roper testified that she received a copy of the covenants at settlement. 376 Md. at 255.
  - In *Schovee*, the court discounted the testimony of only two (of many) buyers to the effect that the lot at issue would not be subdivided further. 356 Md. at 114.
  - In *Point's Reach*, the seller's disclosure (given to all condominium owners) "made plain" that all property owners including condominium owners were to belong to the homeowners' association. 213 Md. App. at 273.

- **Advertising or other marketing or promotional materials**
  - In *Turner*, a sign—which stood on the very lot that was sought to be developed commercially—advertised the lot as a "restricted development." 206 Md. at 356.
  - In *Point's Reach*, condominium owners testified that they saw written sales materials that led them to understand they were buying property in a community that included condominiums and single-family homes. 213 Md. App. at 245.

- **Testimony or conduct from residents or association members**
  - In *Turner*, residents testified that they would not have purchased their lots if they had thought any property in the community was exempt from a commercial use restriction. 206 Md. at 343.
  - In *Schovee*, the Court found that the owners had at least *constructive knowledge* that the lot at issue was excluded from the declaration at issue, particularly when their deeds made reference to that declaration and excluded property *not* within the community. 356 Md. at 113.
  - In *Roper*, the Architectural Control Committee had written to Ms. Roper as a member of the community subject to its covenants and restrictions (and also included assertions in that letter that others in the community viewed her property the same way). 376 Md. at 252-54, 255.
  - In *Point's Reach*, condominium owners conceded that they knew when they bought the units that they would be obligated to pay annual dues assessed by the homeowners' association. 213 Md. App. at 273-74.

18

The Association invokes *Bright v. Lake Linganore Ass'n, Inc.*, 104 Md. App. 394 (1995), and an altogether separate line of cases, for the general proposition that, in the Association's words, "[t]he question of whether a particular declaration is applicable to a particular property must be determined by both the language of the declaration *and* the intentions of the parties." (*quoting Bright*, 104 Md. App. at 415). But that portion of *Bright* asked and answered a different question, *i.e.*, whether the declarations at issue (that required certain lot owners to pay assessments to the homeowners' association) and the general plan of development existed in the first place. In this case, there is no such existential dilemma: we know that the declarations exist and what they say.

**B.    The Property Did Not Fall Within The POCA Declaration, Which Was Not Ambiguous.**

The question for us here is whether the language of the POCA Declaration itself defines its scope in a way that includes the Property, which requires us first to look at whether the scoping language is ambiguous. And as we discuss below, summary judgment was appropriate for three reasons. *First*, the POCA Declaration did not include the Property in the definition of parcels subject to it. *Second*, there was no ambiguity in the POCA Declaration that would have justified looking to extrinsic evidence. And *third*, the Association did not offer any evidence at the summary judgment stage that could have resolved any ambiguity, had there been any, in its favor.

19

### 1. The Property was not included in the POCA Declaration's explicit terms.

The language of the POCA Declaration is crystal clear that property does not come within its scope except under one of the three circumstances: (1) if it is included in the original Declaration as an exhibit; (2) if it is added by Supplemental Declaration; or (3) if it is added by majority vote post-2010. And we know that Supplemental Declarations were easy enough to effectuate, given that there were over fifty such declarations that brought various properties under the reach of the POCA Declaration. None of these three conditions was met here, and the Association doesn't contend that they were.

### 2. The subdivision notes did not create an ambiguity in the POCA Declaration.

The Association claims that eight documents (to which we refer as the "subdivision notes") contain notations creating an ambiguity that requires us to look to extrinsic evidence.[9] We omit the emphasis included in the Association's brief, and add some of our own:

---

[9] It is important to distinguish between an ambiguity *inherent in the language of a deed*, such as that in *Schovee, Turner*, and *Point's Reach*, and an ambiguity in the *scope of a deed*, such as that in *Roper* and that claimed by the Association here. That is, the deed in *Roper* provided that it was "subject to covenants and restrictions of record," but no covenants or restrictions were recorded with the deed. *Id.* at 272. That is a different, and less overt, ambiguity and that is the *most* that the Association can come up with here. The POCA Declaration contains *no language* that even arguably brings the Property within its scope; it can only claim that certain other documents—the subdivision notes—give rise to more than one interpretation about the POCA Declaration's reach.

20

- A January 12, 1989 POMP subdivision plat contained the following notes:

> 6. A declaration of rights of the Piney Orchard Community Association, Inc. *will be contained in a declaration* of covenants, conditions and restrictions for the Piney Orchard Subdivision *which will be recorded* among the land records of Anne Arundel County prior to any subsequent subdivision plats for the property described hereon.

> 7. "Piney Orchard Design Standards and Guidelines—Residential" and "Piney Orchard Design Guidelines—Business" *will be recorded* among the land records of Anne Arundel County with the above-referenced declaration and *shall be referred to* for subsequent development.

- A January 12, 1989 POMP subdivision plat contained the following note:

> 10. Final plans for the "Village Center" shall conform to "Piney Orchard Design Guidelines."

- A January 29, 1989 POMP subdivision plat contained the same notes 6 and 7 as the January 12, 1989 filing.

- A May 25, 1990 POMP subdivision plat contained the following notes:

> 3. This plat is subject to the Piney Orchard design guidelines which were approved by the Anne Arundel County Office of Planning and Zoning on August 24, 1989.

> * * *

> 14. The [Village Center commercial] property shown hereon is subject to the [POCA Declaration].

- An April 30, 1992 POMP subdivision plat contained the following notes:

> 3. The provisions of this plat of subdivision are subject to those agreements, conditions, easements, covenants and other requirements contained in the statement of "General Notes" set

21

forth on the final plats of subdivision for "Piney Orchard P.U.D., Phase 1, Parcel 5A, Village Center."

\* \* \*

7.      The [Village Center commercial] property shown herein is subject to the Piney Orchard Design Guidelines for the Village Center, dated November 10, 1989 (*e.g.*, parking requirements, setbacks, loading spaces, etc.).

- A September 6, 1995 POMP plat document contained the following notes:

7.      The [Village Center commercial] property shown herein is subject to the Piney Orchard Design Guidelines for the Village Center, dated November 10, 1989 (*e.g.*, parking requirements, setbacks, loading spaces, etc.).

\* \* \*

19.      The [Village Center commercial] property shown hereon is subject to the [POCA Declaration].

The Association then cites two other documents that it claims carry even greater weight because *Piney Pad*, and not the Association, recorded them:

- A July 10, 2008 Piney Pad subdivision filing with the following note:

5.      [POMP] has previously caused to be recorded [the POCA Declaration]. The POCA Declaration and Articles of Incorporation and By-Laws (collectively, the "POCA Association Governing Documents") for [the Association] govern and create a lien upon all units, common areas, and other property described in the POCA Declaration, including but not limited to the property described herein, all of which may be developed as one or more condominium regimes. [The Association] was formed primarily to operate and maintain common facilities described in the POCA Declaration.

22

- A July 27, 2012 Piney Pad subdivision filing repeated the language in note 5, this time in note 4.

This universe of subdivision notes hardly constitutes "notice to the world" that satisfies the unambiguous requirements of the POCA Declaration. Although it may overstate things to describe them as "buried" in the filings, the subdivision notes—the first six of which POMP filed, not Piney Pad—do not change the terms of the POCA Declaration. At best (and this is a stretch), they express an unrealized *intent* to bring the Property within the POCA Declaration covenants. As to the last two notes, which Piney Pad contends were reproduced in error, they obviously are not "Supplemental Declarations"—the specific documents that the POCA Declaration explicitly required to bring properties under its purview. Even if the language was included intentionally, and there is no evidence that it was, these isolated notes had no legal effect on the language in the POCA Declaration that defines its scope, just as they would not be able to exempt the Property from the POCA Declaration if its scoping language otherwise included it.

C.     **Even If The Subdivision Notes Did Create An Ambiguity, The Association Failed To Create Any Genuine Issues of Material Fact.**

To be sure, a party opposing a summary judgment motion is not *required* to support its position with an affidavit. *Injured Workers' Ins. Fund v. Orient Exp. Delivery Service, Inc.*, 190 Md. App. 438 (2010). But on the face of Rule 2-501(b), a party opposing summary judgment must identify disputed material facts with particularity and offer evidence or testimony demonstrating the dispute. In this context, that evidence tends to take the form of

23

documentary evidence, such as marketing materials that developers distributed to potential purchasers, and residents' testimony about their understanding of the role a particular property plays within a community. *See Point's Reach*, 213 Md. App. at 273-74; *Roper*, 376 Md. at 252-54; *Schovee*, 356 Md. at 113; *Turner*, 206 Md. at 343. The Association produced no such evidence in the trial court, and thus left the material facts undisputed.

*First*, we disagree with the Association's contention that, standing alone, the subdivision notes "on their face and before even hearing any witness testimony, provide strong evidentiary support for inclusion of the . . . Property within the scope of the POCA Declaration. These recorded documents present issues of material fact which precluded the trial court from entering a declaratory judgment in favor of Piney Pad through summary judgment." To the contrary, the subdivision notes do not present any dispute of *fact* in the first instance. The documents are what they are, and no trial would make them any different in character or change their substance. Their significance from a *legal* point of view is different, and we are able to consider them and conclude that they do not get the Association to the next step in any event.

*Second*, the Association, both in its brief and at oral argument, has claimed it lacked sufficient opportunity to conduct discovery in opposing the Summary Judgment Motion. The trial judge *could have* permitted further discovery, but the Association didn't serve discovery requests before the hearing and did not submit any sort of affidavit detailing the discovery it would need to respond properly. *See* Md. Rule 2-501(d) (permitting the court to order a

24

continuance for further discovery to take place, where a party opposing summary judgment submits an affidavit justifying its failure to set forth facts essential to its opposition). "'The timing of a summary judgment ruling, *i.e.*, whether it is to be postponed pending completion of discovery or denied in favor of submission to the fact-finder, falls within the trial court's discretion and will be reviewed only for abuse.'" *Chaires v. Chevy Chase Bank,* 131 Md. App. 64, 88 (2000) (quoting Paul V. Niemeyer & Linda M. Schuett, Maryland Rules Commentary 95 (2d ed.1992, Supp.1998)); *Clark v. O'Malley*, 169 Md. App. 408, 420-21 (2006). We find no abuse of discretion here.

*Third*, the Association expresses concerns in its brief about the potential impact of the circuit court's decision for the broader community:

> If [Piney Pad is] successful in removing [the Property] from both the commercial and residential covenant regimes governing the Piney Orchard community, the result will be a new, residential condominium community directly adjacent to the Piney Orchard community center and pools, completely surrounded by the more than three (3) square miles of the Piney Orchard community, but not subject to any Piney Orchard governance or restrictions. [Piney Pad plans] to build sixty "two-over-two" residential condominium units on [the Property], [citing Developer's affidavit] and would consider themselves free to follow any architectural or design plans of their choosing, even if inconsistent with architectural and design rules governing the surrounding Piney Orchard community. This new residential development would be exempt from making financial contributions to the upkeep and maintenance of surrounding Piney Orchard common areas, facilities and amenities. Moreover, development of [the Property] as residential housing would deprive residents of the Piney Orchard planned development community commercial and retail establishments that were central to the community's plan, while adding

25

hundreds of additional residents to burden nearby infrastructure and amenities.

We do not doubt the sincerity of these concerns, but the Association never articulated them in a "specific document . . . or other statement under oath," Md. R. 2-501(b), in the circuit court. "Neither general allegations nor mere formal denials are sufficient to establish a material factual dispute," *Vogel v. Touhey*, 151 Md. App. 682, 704-05 (2003), and in any case, these ramifications do not flow from ambiguities in the language of the POCA Declaration.

*Fourth*, other than the subdivision notes (which are *not* deeds or anything close to them) and its generalized concerns, the Association failed to oppose the Summary Judgment Motion with *any* evidence whatsoever—from residents, its own association leaders, realtors, or anyone else—suggesting anyone believed the Property to be subject to the covenants. Although it filed an affidavit from its president, Jeffrey Andrade, he does not say one way or the other that he considered the Property to be commercial or residential in character (for present or future purposes).[10] He describes the Piney Orchard community generally and states that it is primarily a residential community with certain "commercial enterprises that are located in a small retail strip shopping center." He states that the Property is "situated in the midst of the Piney Orchard planned development community," and is "directly adjacent

_____

[10] We *do* know that the Property is zoned for residential development, indicating that even if the Association finds that use undesirable, zoning officials have not found it inappropriate or impracticable.

26

to the Piney Orchard community center."  And he concludes his affidavit with the following two paragraphs:

> 5.  The Property can fairly be said to be centrally located geographically within the Piney Orchard planned development community.
>
> 6.  Although construction of the Piney Orchard community began in approximately 1991, and has resulted in a large and geographically extensive mixed use community, the Property that is the subject of this motion remains open land.

But nothing in this affidavit suggests that the original developers of Piney Orchard or intervening owners represented to Mr. Andrade or anyone else that the Property was intended for any particular use, and no other evidence does so either.

So unlike *Roper*, we have nothing before us that satisfies the requirement of "clear and satisfactory proof" that brings the Property squarely within the scope of *either* the residential restrictions or the commercial restrictions of Piney Orchard.  Instead, we have a dearth of evidence.  The Association did not introduce *any* extrinsic evidence other than subdivision notes—none within any of those important categories—to suggest that the Property should fall within the POCA Declaration or even that it is considered a part of the community overall.  Other than its geographic location near the center of Piney Orchard and those notes, the trial court had nothing to consider in opposition to the Summary Judgment Motion, and so had no reason not to grant it based on the language of the Declaration itself.

*Last*, we address the Association's claim, in reply to Piney Pad's brief, that it identified with particularity the facts in dispute. It supports this claim with the following footnote:

> [The Association] asserts that [the Property] has always been reserved for commercial development within the Piney Orchard planned development community, to serve the commercial needs of that community, while Piney Pad contends that [the Property] is no longer a part of the Piney Orchard planned development community, and therefore is not subject to the declaration and covenants of that community. [The Association] asserts that POMP intended the property to be part of the Piney Orchard planned development community, and Piney Pad denies this contention. [The Association] asserts that Piney Pad itself acknowledged that the POCA Declaration governs [the Property], and Piney Pad denies this contention.

The only citation the Association offers to back up these claims are to *its own* opening brief, and the assertions in the brief—which in turn go unsupported by any affidavit or evidence aside from the subdivision notes—do not generate any genuine issues of material fact that adequately served to counter the Summary Judgment Motion.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**